UNITED STATES of America

v.

John DOE, a/k/a Louw S.
Smith, Appellant.

UNITED STATES of America

v.

Gregory A. NOSE, a/k/a Robert Butler
and Gregory Johnson, Appellant.

UNITED STATES of America

v.

Tarvis NEWSOME, Appellant.

Nos. 88–3146, 88–3148 and 88–3167.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 22, 1990.
Decided May 15, 1990.

Appeals from the United States District Court for the District of Columbia (Criminal Nos. 88–00062–04, 88–00062–03 and 88–00062–02).

Mary E. Davis, Washington, D.C., was on the brief, for appellant in No. 88–3146.

Dennis M. Hart, Washington, D.C., appointed by this Court, was on the brief, for appellant in No. 88–3148.

Robert A. Long, Jr., appointed by this Court, with whom Mitchell Dolin, Washing-

ton, D.C., was on the brief in No. 88–3167, for appellant.

Kirby D. Bejre, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Helen M. Bollwerk and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before EDWARDS, Circuit Judge, ROBINSON, Senior Circuit Judge, and REVERCOMB, District Judge.*

Opinion for the Court filed by Senior Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Senior Circuit Judge:

Appellants seek reversal of their convictions on drug and firearms charges.[1] Several claims of prejudicial error are staked out, but we deem it appropriate to address only two: improper admission of testimony by an expert witness, and improper argument to the jury by the prosecutor. We find merit in these contentions and accordingly reverse.

## I. THE BACKGROUND

Suspecting drug activity in an apartment, police officers engaged an informant to make a purchase therein. The informant reported that a person who spoke with a Jamaican accent sold him crack at the back door. The police then obtained a search warrant and uncovered drugs, drug paraphernalia, firearms and ammunition in the apartment.[2] There, at the time, were John Doe and Gregory Nose, who are Jamaican, and Tarvis Newsome and Herman Robinson, who are black Americans, and the police arrested them all. Subsequently,

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. An earlier joint trial came to naught when the jury was unable to return any verdict at all. On retrial, each appellant was convicted under 21 U.S.C. § 841 (1988) of possession of cocaine and "crack," as cocaine base is known, with intent to

distribute. Doe and Nose were also convicted under 18 U.S.C. § 924(c) (1988) of possession of firearms in relation thereto.

2. The quantity and street value of the drugs suggested strongly that they were destined for sale.

Robinson entered into a plea bargain with the Government.[3]

Prior to selection of the jury, counsel for Newsome called attention to media accounts of threats by Jamaican drug gangs on the life of the Mayor of Annapolis. Expressing concern that this publicity may have affected one or more of the prospective jurors, counsel sought permission to probe during voir dire for possible bias against Jamaicans. The request was granted, and the three defense attorneys jointly framed four questions which were put to the jury venire by Newsome's counsel.[4]

Robinson was the Government's star witness at trial. He testified that he lived in the apartment with Louise Brown, his common law wife, and their three children. To obtain much-needed income, he said, he rented a room to Nose, who promptly assumed control over the premises. Nose, Robinson asserted, moved Newsome and her boyfriend in as occupants, brought in drugs and, together with Doe and Newsome, used the apartment as a base for drug-preparation and -distribution. Drugs were sold inside and at the back door of the apartment, Robinson added, and were delivered to runners for outside sale. Robinson insisted that he was afraid of Nose because he was armed and intimidating.

The Government called as an expert witness Detective Dwight A. Rawls, who, over objection by defense counsel, was allowed to describe the "modus operandi" of Jamaican drug dealers. "The Jamaicans," he said, "have had a phenomen[al] impact on the drug trade in the District of Columbia,"[5] and the market "has been taken over basically by Jamaicans."[6] During the trial, the prosecutor frequently adverted to "the Jamaicans"—in his references to appellants as well as to others—and in summation to the jury he stressed Rawls' theses that Jamaicans had "taken over" the local drug traffic, and were commandeering the apartments of Washingtonians and using them as preparation and distribution centers.

The defense was that Robinson, not appellants, operated the drug enterprise. An assortment of evidentiary items tended to discredit Robinson's testimony at least to some extent. Robinson had been a cocaine addict for years,[7] and recently had served time for a cocaine offense.[8] As a result of his plea bargain and cooperation with the Government in the case at bar, his sentence was only three months of confinement, accompanied by a recommendation that it be served in a halfway house.[9] Brown, who had corroborated Robinson somewhat, likewise was heavily addicted to cocaine.[10] A defense witness testified that some of the drug paraphernalia seized in the apartment belonged to Robinson,[11] and that Robinson had admitted that he sold drugs when earlier he lived in New York.[12] The Government's fingerprint specialist stated that latent prints were found on drug containers and weapons, but that there were no positive comparisons between any of them and those of appellants.[13] Newsome avowed that she neither possessed nor sold cocaine or crack at any time,[14] and that she was merely a visitor in the apartment when the police came in.[15] Appellants were ultimately convicted on all charges, however, and sentenced to lengthy terms of imprisonment.

3. Trial Transcript (Tr.) II at 54–55.

4. Tr. I at 9. The questions are reproduced *infra* note 45. The significance of their propoundment is explained *infra* Part II(C).

5. Tr. VII at 40–41.

6. Tr. VII at 37.

7. Tr. IA at 10.

8. Tr. IA at 13.

9. Tr. III at 15–16.

10. Tr. VI at 76–77.

11. Tr. VII at 156, 172.

12. Tr. VII at 132.

13. Tr. V at 186–189.

14. Tr. VIII at 91–92.

15. Tr. VIII at 84–90. This was confirmed by another witness. Tr. VII at 195–196.

## II. THE RAWLS TESTIMONY

Appellants protest the admission of Detective Rawls' testimony [16] on the ground that evidence of illegal activity by Jamaicans other than Doe and Nose was irrelevant and highly prejudicial, and thus violative of Federal Evidence Rules 402 and 403.[17] The Government counters with argument that Rawls' testimony was proper in rebuttal of appellants' efforts to show that Robinson lied when he told the jury that appellants had forcibly taken his apartment over and conducted drug operations against his will. The Government also contends that "the expert testimony concerned the activities of [only] Jamaican *drug dealers*, not all Jamaicans," and that "[t]he limited nature of this testimony, and the court's instruction regarding the manner in which the jury was to consider expert testimony ... served to minimize the possibility that the testimony would appeal to juror bias." [18]

### A. *Admissibility of Modus Operandi Evidence*

As major support for its position, the Government relies heavily upon the Second Circuit's decision in *United States v. Khan*.[19] At issue there was testimony concerning the price of heroin in Pakistan, the practice among Pakistani dealers of selling heroin on credit, and the sameness of dress among Pakistanis generally, irrespective of economic status. The court held the testimony admissible for purposes of contradicting assertions by the accused that he could not have been a major drug dealer because he was a poor man. The court also rejected as frivolous the claim that such evidence " 'subliminally appeal[ed] to guilt by association and potentially to prejudice against foreigners.' " [20]

As we have recently observed, "[f]ederal courts often permit experts to testify on narcotics operations because jurors are commonly unfamiliar with the methods by which drug dealers attempt to conceal their activities." [21] But we have also recognized

16. Relevant excerpts of that testimony follow:
PROSECUTOR: Has there been any—within the last year, say, including January, has there been any change in the way that [crack is] sold in Washington, D.C.?
DETECTIVE RAWLS: Well, the basic change in the way it's been sold is that the market, *the retail market, has been taken over basically by Jamaicans and....*

\* \* \* \* \* \*

*That most of the local dealers were being replaced on the retail distribution level,* which had been for many—for a long time a local controlled area of drug distribution and they were being replaced by *groups of people that were coming in from other places who basically controlled both limited importation and the distribution.*
PROSECUTOR: *And were these Jamaicans?*
RAWLS: *In many cases.*
PROSECUTOR: At what level have *the Jamaicans,* in your experience, and focusing on January, if you can—at what level and in what way have they been involved in the crack trade in Washington, D.C.?
RAWLS: Well, the level of involvement is that *the Jamaican organizations* tend to do it a little differently than the traditional organizations, in that the importation through retail has been controlled. That is, that the drugs would be imported from South America through Jamaica into the United States and it would be controlled by the same organizations to the final distribution or to the near final distribution, that is, at an almost street level or to the stash house, bundle street level.

PROSECUTOR: In connection with the street level, how have *the Jamaicans* been involved in Washington now, not on the importation side but in Washington, D.C.?
RAWLS: In operating the stash houses and in the actual distribution from control points on the streets.
PROSECUTOR: Now, in operating a stash house, have you noticed any unusual aspect of the way *the Jamaicans* will acquire a house to be used as a stash house?
RAWLS: Usually the house—the house would be acquired by either someone who is already known to the organization who is living there or someone who has, say, limited contact with the organization or someone simply just getting a room into the house and then once they're living there, expanding the use of the house to include the distribution of drugs.
PROSECUTOR: Have you noticed that with regard to *Jamaicans* in your investigations?
RAWLS: Yes.
Tr. VII at 37, 41–42 (emphasis supplied).

17. Fed.R.Evid. 402, 403, quoted, respectively, in relevant part *infra* text at notes 26, 30.

18. Brief for Appellee at 34 (emphasis in original).

19. 787 F.2d 28 (2d Cir.1986).

20. *Id.* at 34.

21. *United States v. Dunn,* 269 U.S.App.D.C. 373, 375, 846 F.2d 761, 763 (1988) (adding that "testi-

that "there is often an inherent danger with expert testimony unduly biasing the jury '[b]ecause of its aura of special reliability and trust[worthiness].' " [22] As a matter of trial fairness, courts should scrutinize such testimony when it becomes potentially harmful; as a legal matter, we shall see, they must do so.

## B. *Relevance*

■ In his opening statement to the jury, the prosecutor made known that Rawls would testify as an expert on "preparation" and "distribution" of cocaine and crack in Washington.[23] It is evident, however, that in substantial part the officer's testimony went far beyond these topics. Rawls avowed that "the retail market has been taken over basically by Jamaicans," and that "the local dealers were being replaced ... by groups of people that were coming in from other places," who "in many cases" were Jamaicans.[24] These statements hardly described for the jury the modus operandi of drug dealers, Jamaican or otherwise, nor could they have provided legitimate assistance to the jurors in determining whether appellants committed the offenses charged.[25] Instead, they focused on monopolization of the local drug market by dealers tracing their ancestry to Jamaica, and strongly suggested that appellants were guilty because two of them are Jamaican. Rawls' testimony obviously had a much broader sweep, and a greater capability of prejudice, than the testimony at issue in *Khan*, which pertained to credit sales to Pakistani drug dealers and the apparel preferred by all Pakistanis, and thus was highly relevant in rebuttal of Khan's defense that he was too poor to operate a dealership. In contrast, Rawls' testimony that Jamaicans were taking over the retail drug trade had no bearing upon any claimed defense or other issue at trial, and was openly allusive in linking the drug charges to appellants solely on the basis of the ancestry of two of them.

Federal Evidence Rule 402 provides that "[e]vidence which is not relevant is not admissible." [26] We think this directive demanded exclusion of Rawls' narration of the so-called Jamaican takeover of the Washington drug market. " 'Relevant evidence,' " Rule 401 says, "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

mony as to modus operandi ... is commonly admitted"). See also *United States v. Anderson,* 271 U.S.App.D.C. 129, 138, 851 F.2d 384, 393 (1988), *cert. denied,* — U.S. —, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989) (upholding admission of expert testimony regarding pimp-prostitute relationships); *United States v. Khan, supra* note 19, 787 F.2d at 34 ("operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702" and "more than satisf[y] the minimal relevancy standards of Fed.R.Evid. 401"); *United States v. Daly,* 842 F.2d 1380, 1388 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (expert testimony as to names, rules and coded language of organized crime families admissible); *United States v. Daniels,* 723 F.2d 31, 33 (8th Cir.1983) (testimony that drug dealers commonly rent apartments and register cars in names of third persons admissible); *United States v. Beltran–Rios,* 878 F.2d 1208, 1210–1213 (9th Cir.1989) (testimony on drug courier profile admissible).

**22.** *United States v. Anderson, supra* note 21, 271 U.S.App.D.C. at 138, 851 F.2d at 393 (quoting *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973)). Accord, *United States v. Angiu-*lo, 847 F.2d 956, 975 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988) ("we have recognized that expert testimony of law enforcement officials concerning the particular methods and practices of those engaged in organized criminal activity carries the risk of prejudicing criminal defendants").

**23.** "You're going to hear testimony from an individual, Detective Dwight Rawls, who's going to testify as an expert as to the distribution and the preparation and the use of cocaine and cocaine base, that is, crack in Washington, D.C., and he's going to tell you a little bit about this drug paraphernalia and how it's used, how cocaine base is made, how it's found, how it's distributed, how much it's worth." Tr. I at 41.

**24.** See note 16 *supra.*

**25.** Appellants were indicted for possession of cocaine and crack *with intent to distribute.* This charge does not associate them with importation, or any other activity unrelated to possession or distribution.

**26.** Fed.R.Evid. 402.

the evidence." [27] Irrelevance is not defined, but it is clear that any evidence failing the test of Rule 401 is "not relevant" under Rule 402.[28] By our appraisal, the testimony on the takeover of the drug traffic did not make the grade on relevance, and should have been excluded. Indeed, its admission encroached upon a right valuable to everyone accused of crime, for "[a]n important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence." [29]

### C. *Probative Value and Harmful Propensity*

■ We realize that other portions of Detective Rawls' testimony were arguably relevant. The person who allegedly sold illicit drugs to the police informant spoke with a Jamaican accent, and the manner in which appellants, according to the Government's evidence, gained dominion over Robinson's apartment coincided with the modus operandi of Jamaican drug dealers as described by the officer. But even if that much of the testimony had some legitimate significance, more was required before it properly could be let in. "Although relevant, evidence may be excluded," so states Federal Evidence Rule 403, "if its probative value is substantially outweighed by the danger of unfair prejudice." [30] The authors of Rule 403 inform us that " '[u]nfair prejudice' within its context means an un-

due tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." [31] The testimony on the apartment takeover, no less than that on the market takeover, certainly had that propensity, and it was never taken into account at trial.

As the Supreme Court has declared, "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." [32] And, the Court tells us,

> because of the risk that the factor of race may enter the criminal justice process, we have engaged in "unceasing efforts" to eradicate racial prejudice from our criminal justice system.[33] Our efforts have been guided by our recognition that "the inestimable privilege, of trial by jury ... is a vital principle underlying the whole administration of criminal justice...." [34] Thus, it is the jury that is a criminal defendant's fundamental "protection of life and liberty against race or color prejudice." [35]

It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case.[36] We refuse to quibble, as does the Government,[37] over whether the remarks about Jamaicans during Rawls' testimony referred strictly to race, for it simply does not matter. In legal theory, distinctions based upon ancestry are as "odious" [38] and

---

**27.** Fed.R.Evid. 401.

**28.** 22 C. Wright & K. Graham, Federal Practice & Procedure § 5202 at 237 (1978).

**29.** *Bruton v. United States,* 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 1625 n. 6, 20 L.Ed.2d 476, 482 n. 6 (1968).

**30.** Fed.R.Evid. 403. As we ourselves have put it, "probative value must outweigh the probability of prejudice before even relevant evidence may be admitted." *United States v. Marcey,* 142 U.S. App.D.C. 253, 256, 440 F.2d 281, 284 (1971).

**31.** Fed.R.Evid. 403 advisory committee's note.

**32.** *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739, 749 (1979).

**33.** Quoting at this point *Batson v. Kentucky,* 476 U.S. 79, 85, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69, 80 (1986) (footnote omitted).

**34.** Quoting at this point *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 123, 18 L.Ed. 281, 296 (1866) (footnote omitted).

**35.** *McCleskey v. Kemp,* 481 U.S. 279, 309, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262, 289 (1987) (quoting at this point *Strauder v. West Virginia,* 100 U.S. 303, 309, 25 L.Ed. 664, 666 (1880)).

**36.** E.g., *McCleskey v. Kemp, supra* note 35, 481 U.S. at 308, 107 S.Ct. at 1775, 95 L.Ed.2d at 289.

**37.** Brief for Appellee at 30 n. 35.

**38.** "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774, 1786 (1943) (American citizen of Japanese ancestry).

"suspect" [39] as those predicated on race; [40] in practical terms, appeals to either threaten the fairness of a trial. And the fact that only two of the three appellants are of Jamaican descent does not lessen the prejudicial impact on the third. To begin with, the record reflects that "the Jamaicans," when those words were used in reference to appellants, made little or no distinction between them; [41] more importantly, it appears that the Advisory Committee contemplated that Rule 403 would be applied to protect coparties of the opponent of the evidence [42]—a position taken in prior case-law. [43]

■ Here the District Court did not undertake to strike the Rule 403 balance between probative value and prejudicial effect of Rawls' testimony on Jamaican takeovers, either of drug activities or local apartments. Rather, the court let in all of that testimony solely because defense counsel had opted on voir dire of the prospective jurors to inquire as to whether it would be more difficult for them to afford Jamaicans the same fair trial they would accord citizens of the United States. [44] We do not share the view that questions on voir dire calculated to obtain a qualified and impartial jury [45] open the door to introduction of evidence harboring a decided penchant for harm. The Supreme Court has held that "[i]f the circumstances of a particular case indicate a significant likelihood that racial bias may influence a jury,

**39.** "[A]ll legal restrictions which curtail the civil rights of a single racial group are immediately suspect." *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194, 199 (1944) (American citizen of Japanese descent).

**40.** See *Hernandez v. Texas,* 347 U.S. 475, 477–480, 74 S.Ct. 667, 669–671, 98 L.Ed. 866, 869–871 (1954) (person of Mexican descent); *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 418–421, 68 S.Ct. 1138, 1142–1144, 92 L.Ed. 1478, 1486–1488 (1948) (Japanese resident alien); *Oyama v. California,* 332 U.S. 633, 646–647, 68 S.Ct. 269, 275–276, 92 L.Ed. 249, 259 (1948) (Japanese American); *Korematsu v. United States, supra* note 39; *Hirabayashi v. United States, supra* note 38; *Truax v. Raich,* 239 U.S. 33, 39–43, 36 S.Ct. 7, 9–11, 60 L.Ed. 131, 134–136 (1915) (Austrian resident alien). See also *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582, 592 (1987) (person of Arabian ancestry).

**41.** Illustrative is a portion of the cross-examination of one of the law enforcement officers who participated in the raid of the apartment:

> Mr. Lumbard: Mr. Neal, when [Robinson] said it belonged to the Jamaicans, what was he referring to?
> Officer Neal: [T]he dope and the guns that we found.
> Mr. Lumbard: Now, when he referred to the Jamaicans, you understood him to be referring to [Nose and Doe], didn't you?
> Officer Neal: I understand—My understanding it was the people that we had arrested other than him and his wife.
> Mr. Lumbard: The reference to Jamaican, you understood that to refer to Tarvis Newsome? Is that correct?
> Officer Neal: Yeah. The lady was also arrested.... My understanding was that when

he said Jamaicans, he was talking about the group that was selling the drugs, other than him and his wife at the time.... The Jamaicans came in and supposedly took over his house.
Tr. IV at 172–173.

**42.** C. Wright & K. Graham, Federal Practice & Procedure § 5215 at 279 (1978). In support of this proposition, the authors draw upon Fed.R. Evid. 105, which provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

**43.** See *Spurlin v. General Motors Corp.,* 531 F.2d 279, 281 (5th Cir.1976).

**44.** Tr. VII at 39–40.

**45.** The following questions were put to the prospective jurors:

> There have been numerous articles in newspapers and numerous broadcasts on television stations concerning Jamaican nationals who are alleged to have been involved in narcotic trafficking. My first question is, who among you have read, seen or heard about Jamaican nationals involved with narcotics? ... More specifically, did you see on television or read in any newspaper a story about the Mayor of Annapolis and Jamaican drug dealers? Has anything you have heard or seen caused you to form an opinion about Jamaicans? Would the fact that one or more of the defendants might be from Jamaica make it more difficult to give them the same fair trial you could give to a citizen of the United States?
> Tr. I at 9.

the Constitution requires questioning as to such bias,"[46] and this court has echoed the same principle.[47] Concerned that media coverage of Jamaican drug activities in a neighboring community might influence the jury, defense counsel sought to ferret out any member of the venire seemingly unable to give appellants a fair trial. An accused cannot be compelled to sacrifice this means to an impartial jury in order to assure the evidentiary fairness of the trial. We hold that the District Court erred in

46. *McCleskey v. Kemp, supra* note 35, 481 U.S. at 309 n. 30, 107 S.Ct. at 1776 n. 30, 95 L.Ed.2d at 289 n. 30 (citing *Ristaino v. Ross,* 424 U.S. 589, 596, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258, 264 (1976)). See also *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46, 50 (1973) ("the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the petitioner be permitted to have the jurors interrogated on the issue of racial bias") (citations omitted); *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054, 1058 (1931) ("the essential demands of fairness" require voir dire examination of prospective jurors concerning racial prejudice).

47. See *United States v. Liddy,* 166 U.S.App.D.C. 95, 101–102, 509 F.2d 428, 434–435 (1974) (*en banc* ), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975) (individual voir dire examination regarding pretrial publicity is required whenever it is believed that there is a significant possibility that a prospective juror may be ineligible to serve because of exposure to potentially prejudicial publicity). *United States v. Robinson,* 154 U.S.App.D.C. 265, 270, 475 F.2d 376, 381 (1973) (racial prejudice is one of the recognized classes of prejudice for which "there is a constant need for a searching voir dire examination").

48. Brief for Appellant Nose at 23–25; Brief for Appellant Newsome at 13–18; Brief for Appellant Doe at 12 (incorporating discussion by reference). In order to place the prosecutor's remarks in proper context, we set forth in full the challenged portions of his summation:
> PROSECUTOR: Now, ladies and gentlemen, the government's case—and I'll be very brief.... When you think about what was happening there on Lincoln Road back in January, think of the framework that you heard in the testimony of Byron Neal, Detective Byron Neal, and Detective Dwight Rawls, both of those experienced detectives.... You heard the schooling that Dwight Rawls has had, the fact that he was qualified as an expert. You heard Byron Neal, the detective that has had all that experience in Washington, D.C. on narcotics cases, testify as to what

admitting the impugned portions of the testimony of Detective Rawls.

## III. THE PROSECUTOR'S SUMMATION

Appellants further contend that over and above the introduction of Rawls' testimony, the prosecutor overstepped the bounds of propriety in his comments, during summation to the jury, on the activities of Jamaicans, including appellants.[48] Referring to Rawls' testimony, the prosecutor said:

> was happening there, what goes on in this city of ours these days, what is the phenomenon that we have now and we had back in January of 1988. Something we brought in an expert to testify on that, because this is something that you may not know from your own common experience, but you've heard an expert testify about it.
>
> And what is happening in Washington, D.C. is that Jamaicans are coming in, they're taking over the retail sale of crack in Washington, D.C. It's a lucrative trade. The money, the crack, the cocaine that's coming into the city is being taken over by people just like this—just like this. They're moving in on the trade. They're going to make a lot of money on it....
>
> Now, ladies and gentlemen, that's the framework for this case. How do they do it? One of the ways they did it, both Dwight Rawls and Byron Neal testified one of the ways they do it, they come into an area, they start living in an apartment, they find an apartment where they can carry out this trade, they come in surreptitiously at first, innocently at first, and then essentially, they take it over, and they sell the cocaine out of that apartment until that's over. And then they move on to a different location. And isn't that exactly, precisely what happened in this case, according to the testimony that you heard?
>
> And remember [appellant Nose's counsel] was asking Byron Neal, saying: Well, why did you come up to Herman Robinson, why did you go up to him and say, "How did you let something like this happen in your apartment?" ... Wasn't the incredulous question of why would you just go up to Herman Robinson and say that? Why didn't you go up to [Nose], why didn't you go up to [Doe] and say that and ask, "Why did you let this go on in the apartment?" No. They went to Herman Robinson. They went to the Washington, D.C. native, the Washington, D.C. resident, the person whose apartment it was....
>
> And sure enough, Herman Robinson told you. He said the drugs and the guns were the Jamaicans. "They came into my apartment and I was afraid of them." And didn't Dwight Rawls testify that that is what's happening in

And what is happening in Washington, D.C. is that Jamaicans are coming in, they're taking over the retail sale of crack in Washington, D.C. It's a lucrative trade. The money, the crack, the cocaine that is coming into the city is being taken over by people just like this—just like this. They're moving in on the trade. They're going to make a lot of money on it....[49]

Asking "[h]ow do they do it," the prosecutor continued:

One of the ways they did it, both Dwight Rawls and Byron Neal testified one of the ways they do it, they come into an area, they start living in an apartment, they find an apartment where they can carry out this trade, they come in surreptitiously at first, innocently at first, and then essentially, they take it over, and they sell the cocaine out of that apartment until that's over. And then they move on to a different location. And isn't that exactly, precisely what happened in this case, according to the testimony that you heard?[50]

Then, after adverting to testimony by Robinson, the prosecutor stated:

And didn't Dwight Rawls testify that that is what's happening in Washington, D.C. these days? They're coming into the apartments, they're taking them over, they're using them for drugs, they're using them to package the drugs, to cook them, to sell them on the street. And how do they do it? They do it through fear and intimidation, through guns, swaggering around the house with the guns, the threats, the violence that's

Washington, D.C. these days? They're coming into the apartments, they're taking them over, they're using them for drugs, they're using them to package the drugs, to cook them, to sell them on the street. And how do they do it? They do it through fear and intimidation, through guns, swaggering around the house with the guns, the threats, the violence that's just under the surface there with these two gentlemen. That's how they do it. And that's the framework for you to consider this case in. That's the way the case came out.

\*   \*   \*   \*   \*   \*

That's the phenomenon, that's what you had at 1711 Lincoln Road.

Tr. X at 17–20.

just under the surface there with these two gentlemen. That's how they do it. And that's the framework for you to consider this case in. That's the way the case came out.[51]

These observations are characterized as "a blatant attempt to have the jury punish appellant[s] for the emotional headlines that were current at the time,"[52] and as an impermissible appeal to "the jury to consider the fact that because 'people just like this—just like this' are taking over the cocaine business[,] ... the [appellants] are guilty because they share the same nationality as those whom Detective Rawls described in such negative terms."[53] The Government, while conceding that "the reference to 'people just like this' ... was probably better left unsaid," maintains that "it was not reversible error" because the prosecutor was merely summarizing the expert testimony of Detective Rawls.[54] The Government further contends that "the prosecutor's single and brief statement regarding 'people just like this' was not the focus of his argument and did not jeopardize the fairness and integrity of the trial,"[55] and that "[t]he insignificance and fleeting nature of the alleged misstatements is underscored" by the absence of any objection by appellants.[56]

## A. The Caselaw on Racial Remarks

■ Federal courts have long condemned racially inflammatory remarks during governmental summation.[57] Recently, the Supreme Court stated flatly, as at least

49. Tr. X at 18.

50. Tr. X at 18.

51. Tr. X at 19.

52. Brief for Appellant Nose at 23.

53. *Id.*

54. Brief for Appellee at 36.

55. *Id.*

56. *Id.*

57. See cases cited *infra* notes 58–59.

two circuits had already held,[58] that "[t]he Constitution prohibits racially-biased prosecutorial arguments." [59] Racial fairness of the trial is an indispensable ingredient of due process [60] and racial equality a hallmark of justice.[61] Appeals to racial passion can distort the search for truth and drastically affect a juror's impartiality.[62]

We speak, of course, only of racial comments beyond the pale of legally acceptable modes of proof. An unembellished reference to evidence of race simply as a factor bolstering an eyewitness identification of a culprit, for example, poses no threat to purity of the trial. The line of demarcation is crossed, however, when the argument shifts its emphasis from evidence to emotion.[63] When that is done, it matters not whether the reference is to race, ancestry or ethnic background.[64]

**58.** *McFarland v. Smith,* 611 F.2d 414, 416–417 (2d Cir.1979) (prosecutor's statement during summation that black officer, a prosecution witness, was more likely to be truthful when testifying against black defendant was reversible constitutional error); *United States ex rel. Haynes v. McKendrick,* 481 F.2d 152, 156–159 (2d Cir.1973) (prosecutor's repeated references to "colored people" was prejudicial constitutional error); *Miller v. North Carolina,* 583 F.2d 701, 706–707 (4th Cir.1978) (prosecutor's references during rape trial to defendants as "these black men," and argument that defense based on consent was inherently untenable because no white woman would ever consent to sexual relations with a black man, was harmful constitutional error).

**59.** *McCleskey v. Kemp, supra* note 35, 481 U.S. at 309 n. 30, 107 S.Ct. at 1776 n. 30, 95 L.Ed.2d at 289 n. 30 (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 436–437 (1974)). Frequently, the decisional rationale stated has simply been trial unfairness, without constitutional overtones. E.g., *United States v. Sanchez,* 482 F.2d 5, 8 (5th Cir.1973) (argument "replete with racial and political undertones"); *Kelly v. Stone,* 514 F.2d 18, 19 (9th Cir.1975) (black defendant denied a fair trial by prosecutor's exhortations during summation in forcible rape case to "[t]hink about the consequences of letting a guilty man, a man guilty of serious and rather horrible crime, go free. Because maybe the next time it won't be a little black girl from the other side of the tracks; maybe it will be somebody you know.... And maybe the next time he'll use the knife"); *Fontanello v. United States,* 19 F.2d 921, 922 (9th Cir.1927) (summarized *infra* note 91).

**60.** *Batson v. Kentucky, supra* note 33, 476 U.S. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82 (prosecutor constitutionally forbidden to exercise peremptory challenges on basis of race); *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556 (1985) (prosecutorial discretion cannot be exercised on basis of race); *United States v. Batchelder,* 442 U.S. 114, 162 n. 9, 99 S.Ct. 2198, 2205 n. 9, 60 L.Ed.2d 755, 765 n. 9 (1979) (same); *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453 (1962) (same); *Irwin v. Dowd,* 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751, 759 (1961)

(change of venue may be constitutionally necessitated by widespread prejudice in community); *Ristaino v. Ross, supra* note 46, 424 U.S. at 595, 96 S.Ct. at 1021, 47 L.Ed.2d at 264 (Constitution requires questioning of prospective jurors where circumstances indicate significant likelihood that jury might be influenced by racial bias). See also *Turner v. Murray,* 476 U.S. 28, 36–37, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27, 36–37 (1986) (defendant convicted of interracial murder is constitutionally entitled to such questioning at sentencing hearing, irrespective of circumstances of particular case).

**61.** E.g., *Vasquez v. Hillery,* 474 U.S. 254, 262, 106 S.Ct. 617, 622–623, 88 L.Ed.2d 598, 608 (1986) (racial considerations influencing selection of grand jurors); *Whitus v. Georgia,* 385 U.S. 545, 550–552, 87 S.Ct. 643, 646–648, 17 L.Ed.2d 599, 604–605 (1967) (racial considerations influencing selection of petit jurors).

**62.** E.g., *United States ex rel. Haynes v. McKendrick, supra* note 58, 481 F.2d at 157.

**63.** The impropriety of pleas capable of arousing racial biases is consistently recognized even when they fall short of the danger zone, or are justified by the circumstances. E.g., *United States v. Hernandez,* 865 F.2d 925, 928 (7th Cir. 1989) (reference to "Cuban drug dealers"); *United States v. Horne,* 423 F.2d 630, 631–632 (9th Cir.1970) (allusion to fact that defendant was black).

**64.** See *United States v. Chase,* 838 F.2d 743, 750 (5th Cir.), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988) (reference to "Columbians"); *United States v. Hernandez, supra* note 63, 865 F.2d at 927–928 (reference to "Cuban drug dealers"); *United States v. Janis,* 831 F.2d 773, 778 (8th Cir.1987), *cert. denied,* 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988) (remarks concerning Indians); *Fontanello v. United States, supra* note 59, 19 F.2d at 922 (references to "Italian" bootleggers); *United States v. Rodriguez,* 765 F.2d 1546, 1560 n. 19 (11th Cir.1985) (reference to defendants' Cuban nationality); *Coreas v. United States,* 565 A.2d 594, 605 (D.C.1989) (comment calculated to arouse national bias against immigrant from El Salvador); *State v. Sheeler,* 300 S.W. 318, 321 (Mo.App.1927) (reference to "the Italian bootleg-

## B. *The Failure to Object*

■ Since appellants did not object to the prosecutor's summation, we encounter at the outset the question whether they can now surmount the familiar rule that errors not timely complained of at trial ordinarily will not be considered on appeal.[65] This inquiry must center on Federal Criminal Rule 52(b),[66] providing that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."[67]

While the plain-error doctrine of Rule 52(b) serves well the cause of justice by "temper[ing] the blow of a rigid application of the contemporaneous objection requirement"[68] when the occasion demands, courts must not lose sight of the objectives it was designed to achieve.[69] It is not a license "to consider trial court errors not meriting appellate review absent timely ob-

jection;"[70] rather, it "is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result,' "[71] and only to correct " 'particularly egregious errors.' "[72] But plain-error review is entirely appropriate when the matter complained of " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings,' "[73] and that, we think, was plainly the case here.

## C. *The Government's Justifications*

■ We reject outright the Government's claim that the prosecutor's remarks were "fleeting" and "insignifican[t]."[74] "Even if brief, use of race as a factor in closing argument [is] improper,"[75] and, to boot, the Government's description of the prosecutor's utterances is grossly inaccurate. The Government refers only to the prosecutor's comment regarding "people

gers"); *State v. Belgarde,* 110 Wash.2d 504, 755 P.2d 174, 176–177 (1988) (derogatory remarks concerning members of American Indian Movement). While in some of these cases the statements were held to be harmless under the circumstances, in each instance they were condemned.

65. E.g., *United States v. Allen,* 203 U.S.App.D.C. 17, 23 n. 5, 629 F.2d 51, 57 n. 5 (1980); *United States v. DeLoach,* 174 U.S.App.D.C. 138, 148 & n. 15, 530 F.2d 990, 1000 & n. 15 (1975), *cert. denied,* 426 U.S. 909, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976); *United States v. Smith,* 160 U.S.App.D.C. 221, 226–227, 490 F.2d 789, 794–795 (1974).

66. E.g., *United States v. Debango,* 250 U.S.App.D.C. 419, 422, 780 F.2d 81, 84 (1986) (where no objection to instruction was registered at trial, appellant must demonstrate plain error).

67. Fed.R.Crim.P. 52(b). The plain-error rule came into existence long before promulgation of the Federal Criminal Rules. See, e.g., *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936) ("especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings"); *Wiborg v. United States,* 163 U.S. 632, 658, 16 S.Ct. 1127, 1137, 41 L.Ed. 289, 298 (1896) ("although this question was not properly raised, yet if a plain error was committed in a matter so absolutely vital to *defendants, we feel ourselves at liberty to correct it*"). Rule 52(b) is but a restatement of preexisting caselaw, Fed.R.Crim P. 52(b) advisory committee's note, to which current decisions

frequently resort. See, e.g., *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985), quoted *infra* text at note 73.

68. *United States v. Young, supra* note 67, 470 U.S. at 15, 105 S.Ct. at 1046, 84 L.Ed.2d at 12.

69. See, e.g., *United States v. Byers,* 239 U.S.App. D.C. 1, 20–35, 740 F.2d 1104, 1124–1139 (*en banc* ) (1984) (concurring opinion).

70. *United States v. Young, supra* note 67, 470 U.S. at 16, 105 S.Ct. at 1046, 84 L.Ed.2d at 13 (footnote omitted).

71. *Id.* at 15, 105 S.Ct. at 1046, 84 L.Ed.2d at 12 (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982)).

72. *Id.* at 15, 105 S.Ct. at 1046, 84 L.Ed.2d at 12 (quoting *United States v. Frady, supra* note 71, 456 U.S. at 163, 102 S.Ct. at 1592, 71 L.Ed.2d at 827)).

73. *Id.* at 15, 105 S.Ct. at 1046, 84 L.Ed.2d at 12 (quoting *United States v. Atkinson, supra* note 67, 297 U.S. at 160, 56 S.Ct. at 392, 80 L.Ed. at 557). Accord, *United States v. Blackwell,* 224 U.S.App.D.C. 350, 366, 694 F.2d 1325, 1341 (1982).

74. Brief for Appellee at 36.

75. *Brooks v. Kemp,* 762 F.2d 1383, 1413 (11th Cir.1985) (*en banc* ), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).

just like this," [76] disregarding all other unseemly statements by the prosecutor during summation. Among the observations ignored are those portraying "Jamaicans ... coming in [and] taking over the retail sale of crack in Washington, D.C.," [77] and those declaring that Jamaicans are "coming into the apartments, they're taking them over, they're using them for drugs, they're using them to package the drugs, to cook them, and to sell them on the street" [78]—components of the "framework" for the jury's consideration of the case.[79] Decisions proffered by the Government [80] are distinguished by these factors, for they introduce a wholly different magnitude of prejudice.

■ Nor are we impressed by the Government's contention that the prosecutor's discussion passes muster as a mere summary of Detective Rawls' testimony.[81] We have held that part of that testimony was irrelevant and prejudicial, and that the rest was inadmissible for lack of balancing to determine whether its probative value outweighed its harmful effect.[82] Obviously, argument founded on that testimony stands on no higher ground.

■ Lastly, we find no merit in the Government's contention that counsel for appellants also made references to "the Jamaicans." Appellants' counsel did make inquiries as to whether particular individuals spoke with a Jamaican accent, but manifestly that was because the person who allegedly sold drugs to the police informant had such an accent. Defense counsel occasionally parroted the prosecutor, but their references to Jamaicans were well nigh dictated by the nature of particular items of the Government's evidence.[83] The technique of defense counsel in these respects was totally dissimilar to the prosecutor's, and affords no basis for the verbal license the prosecutor expropriated and so freely exercised.

D. *Prejudicial Effect*

■ We conclude, then, that the prosecutor's discourse on the activities of Jamaican drug dealers and the accompanying tie-in with appellants were legally improper, and thus reach the remaining question whether they were prejudicial.[84] With prosecutorial error of constitutional dimension,[85] the Government has the burden of establishing that it was harmless,[86] and

76. Brief for Appellee at 36.

77. See text *supra* at note 49.

78. See text *supra* at note 51. See also text *supra* at note 48.

79. See note 48 *supra.*

80. In *Rojas v. Richardson,* 713 F.2d 116 (5th Cir.1983), a ranch-hand sought damages for personal injuries sustained when he was thrown from a horse. During summation, counsel for the defendant argued that the plaintiff "shouldn't be entitled to any extra benefits because he is an illegal alien in this country than would any other citizen of the United States be entitled." *Id.* at 117. No objection to these remarks was made and the jury returned a verdict for the defendant. On appeal, it was held that since the plaintiff's legal status had been brought out during voir dire, jurors were aware that he was an illegal alien, and that although counsel's remark was "highly prejudicial and a blatant appeal to jury bias," *id.* at 118, there were no "exceptional circumstances" warranting its treatment as plain error "to avoid a miscarriage of justice." *Id.*
    In *United States v. Hernandez, supra* note 63, the prosecutor stated during summation that

"each of you by the verdict that is represented by the evidence will send a clear message to Cuban drug dealers and drug dealers in these United States." 865 F.2d at 927. This was the prosecutor's only reference to Cubans, and curative instructions were given by the trial judge. The Seventh Circuit concluded that "within the context of the entire trial, the remark was not so inflammatory as to prejudice the defendant." *Id.* at 928.

81. Brief for Appellee at 35.

82. See Parts II(B), II(C) *supra.*

83. See, for an example, note 41 *supra.*

84. "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a).

85. See notes 58–61 *supra* and accompanying text.

86. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967). See also *United States ex rel. Haynes v. McKendrick, supra* note 58, 481 F.2d at 161; *Miller v. North Carolina, supra* note 58, 583 F.2d at 707–708.

that the Government can do only if we are "able to declare a belief that it was harmless beyond a reasonable doubt." [87] We are satisfied that the Government cannot survive that exacting test.

The evidence against appellants, though considerable, was hardly overwhelming. The central issue at trial was the person or persons conducting the drug activities in Robinson's apartment. Robinson, by far the Government's key witness, was a cocaine addict and possibly a drug dealer in the past, who had obtained an extremely light sentence in exchange for his agreement to aid the prosecution. The Government's proofs left largely unresolved the question of ownership of particular items of incriminating physical evidence found during the search of the apartment. Several circumstances tended positively to show that appellants were not the operators of the drug-distribution enterprise based therein; [88] indeed, the jury in the first trial was unable to agree that any appellant was guilty of any of the offenses charged.

Undeniably, prosecutorial remarks kindling racial or ethnic predilections "can violently affect a juror's impartiality." [89] Comments of that sort are especially egregious because of "the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with his office, but also because of the fact-finding facilities presumably available to him." [90] Just how much influence the prosecutor's summation exerted upon the jury is, of course, incapable of precise measurement, but its portent for harm is ominous.[91] We thus are unable to say that beyond a reasonable doubt the prosecutor's improper argument did not contribute significantly to appellants' convictions.[92]

## IV. CONCLUSION

We know that " '[t]here is ... strong temptation to relax rigid standards when it seems the only way to sustain convictions of evildoers.' " [93] That, we agree, this "is especially true where the conviction is for a narcotics violation at a time when the country is engaged in a 'war on drugs.' " [94] But "[the] courtroom is not the proper place in which to fight such a 'war,' " [95] and "[a] defendant charged with a narcotics violation is presumed innocent ... until proven guilty beyond a reasonable doubt after a fair trial." [96]

87. E.g., *Chapman v. California, supra* note 86, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 711.

88. See text *supra* at notes 7–15.

89. *United States ex rel. Haynes v. McKendrick, supra* note 58, 481 F.2d at 157. See also *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

90. Standards Relating to the Prosecution Function and the Defense Function § 5.8 & commentary at 126–127 (1971).

91. The cases before us resemble *Fontanello v. United States, supra* note 59. There, the several defendants, all Italian, had been charged with operating an illicit still. During summation, the prosecutor said to the jury:

> These men are Italians. We welcome them to our country. They should obey our laws. It is a matter of everyday knowledge that the majority of people in King County running stills are of the same nationality; that whenever we have a still case in this court in a great many cases we find the last name similar to these: Fontanello, Rocco, and Pinola. Now look at the information in this case. Dominick Fontanello, Tony Fontanello, Paulo Rocco, John Pinola, and 400 per cent of them foreign population.

19 F.2d at 921. The court held that these remarks "were objectionable on two grounds:" They tended to create race prejudice, and they conveyed the imputation that the accused belonged to a class of persons peculiarly addicted to the illicit distillation of liquors. Remarks such as these, which are not withdrawn, when brought to the attention of court and counsel, constitute prejudicial error, which requires reversal. *Id.* at 922.

92. Compare *Miller v. North Carolina, supra* note 58, 583 F.2d at 707 n. 7.

93. *United States v. Edwardo–Franco,* 885 F.2d 1002, 1011 (2d Cir.1989) (quoting *Krulewitch v. United States,* 336 U.S. 440, 457, 69 S.Ct. 716, 725, 93 L.Ed. 790, 801 (1949) (concurring opinion)).

94. *Id.* at 1011.

95. *Id.*

96. *Id.*

The judgments of conviction are reversed, and the cases are remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*