DAVIS, Senior Circuit Judge,
dissenting:
The Government correctly concedes that it was constitutional error for prosecutors to elicit and rely upon testimony consisting of a blatant ethnic generalization in hopes that the jury would draw inferences adverse to Appellant Alejandro Garcia-Lagu-nas. Because the Government failed to prove beyond a reasonable doubt that its reliance on such testimony did not contribute to the jury’s verdict, as my friends in the majority implicitly acknowledge, I am compelled to dissent from their conclusion to affirm the judgment.
During his trial, Garcia-Lagunas sought to show that he was, at most, a common drug abuser and not a sophisticated drug distributor who trafficked in large volumes of cocaine. To make this distinction, Garcia-Lagunas utilized questions during cross-examination of prosecution witnesses to establish that he lived a meager lifestyle devoid of any of the drug proceeds that should follow a high-volume distributor. For example, when cross-examining Detective Shawn Collins, Garcia-Lagunas elicited testimony about the assets discovered at the residences o’f Ronnie Reed, one of Garcia-Lagunas’s alleged purchasers and a Government witness. J.A. 153-55. During searches of Reed’s residences related to federal drug trafficking charges, officers found and ultimately seized more than $100,000 in U.S. currency, multiple telephones, a 2008 Infíniti, a 2006 Chevy Impala, a 2004 Acura, a 2004 BMW, a 2002 Lincoln Navigator, and multiple firearms. J.A. 154-55.
Contrasting this showing of the wealth accumulated by Reed during the four to five years that he sold drugs prior to his 2012 arrest, the cross-examinations of Detective Collins and Detective Pedro Orella-no established that Garcia-Lagunas lived a life of limited means. Their testimony showed that, on the evening detectives arrested Garcia-Lagunas, ' he was found shirtless and shoeless in the “kitchenfiiving room area” of a small trailer in which - he rented a room for less than $350 per month. J.A. 103-04, 315. The detectives did not find any vehicles belonging to Garcia-Lagunas, and they only uncovered $600 in currency. J.A. 176. Ultimately, Garcia-Lagunas hoped this testimony would cause the jury to ask: how can a man who is allegedly responsible for selling hundreds of thousands of dollars in cocaine[1] have no proceeds to evidence those transactions? Any experienced (and even an inexperienced) Assistant United States Attorney prosecuting cases in this Circuit would fully expect (and be prepared for) this kind of defense tack on this record.
As Garcia-Lagunas’s defense theory became apparent during trial, however, the *770 Government seemingly recognized for the first time the absence of drug trafficking proceeds as a potential weakness in its case. The Government opted not to cure the ostensible weakness through the introduction of admissible evidence by, for example, moving to admit proof of wire transfers from Garcia-Lagunas to family in Mexico. Either because such evidence did not exist[2] or because the Government failed to adequately prepare its case, it instead sought to counter the theory offered by Garcia-Lagunas by eliciting an outrageous ethnic stereotype about the propensity of “Hispanic drug traffickers” to live modestly while sending “the majority if not all the proceeds back to their native countries.” J.A. 270. The Government then drove this racial generalization home at the outset of its closing argument, stating:
Ladies and Gentlemen, what did Detective Orellano tell you about Hispanic drug trafficking organizations and about what they do with their money? He told you that they package that money and they send it back to their home country as part of the drug trafficking organization. That’s why we don’t have an extravagant lifestyle associated with this Defendant, fancy cars, any of the things like Ronnie Reed has talked about.
J.A. 520.
The relative ability of this particular stereotype to sway the jury is evidenced by its effect on the presiding judge. In response to a renewed objection to Detective Orellano’s testimony, the trial judge held a bench conference and admitted that he “wasn’t quite sure the relevance of’ the Detective’s, testimony regarding Hispanic drug traffickers, but that, “based on [his] experience, ... most Latins send money home whether they’re drug dealers or not,”[3] J.A. 273. The Government admittedly hoped the jurors would draw a similar inference when rendering a verdict. J.A. 273.
As the majority explains, “[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant’s Fifth Amendment right to a fair trial.” United States v. Cabrera, 222 F.3d 590, 594 (9th Cir.2000). A number of our sister circuits have interpreted this basic principle to mean that a constitutional error occurs when the Government “invite[s] the jury to put [a defendant’s] racial and cultural background into the balance in determining their guilt.” United States v. Vue, 13 F.3d 1206, 1213 (8th Cir.1994); United States v. Cruz, 981 F.2d 659, 663-64 (2d Cir.1992); United States v. Doe, 903 F.2d 16, 20-24 (D.C.Cir.1990). This is exactly what the Government did here.
To counter Garcia-Lagunas’s primary defense theory and cure a perceived hole in its case, the Government offered up generalizations about Garcia-Lagunas’s *771 ethnicity to the jury. The Government hoped that, like the presiding judge, the jurors would believe that Garcia-Lagunas’s modest lifestyle did not undermine allegations that he distributed hundreds of thousands of dollars in cocaine because he had assuredly been sending his significant proceeds back to his native country, electing to live like a pauper here. And while the majority seeks to distinguish the ethnic generalization tactically elicited and repeated in this case on the ground that the ethnically based “evidence” was used in a more nuanced fashion than was true in the cases decided in our sister circuits, the Government’s specific method for injecting Garcia-Lagunas’s ethnicity as evidence in favor of his guilt makes it no less improper.
Most tellingly, even the Government concedes that the elicitation of Detective Orellano’s testimony during re-direct and recitation of the testimony at the outset of closing argument amounted to a constitutional error. Oral Argument at 20:38-20:51, United States v. Garcia-Lagunas, No. 14-4370 (Sept. 17, 2015), available at http://coop.ca4.uscourts.gov/OAarchive/mp 3/14-4370-20150917.mps. During oral argument, when asked whether the error amounted to constitutional error, counsel for the Government responded unequivocally, “Yes.” Id. The Panel then asked, as a result of the Government’s belief that constitutional error had occurred, whether it was the Government’s burden “to prove beyond a reasonable doubt that the error had no substantial effect on the jury’s verdict.” Id. In response, counsel for the Government firmly stated, “That’s correct.” Id.
Accordingly, because the Government’s appeal to an ethnic generalization was plainly a constitutional error and because the Government failed to prove beyond a reasonable doubt that its reliance on such testimony did not contribute to the jury’s verdict in a drug conspiracy case resting almost entirely on the testimony of four drug dealers testifying pursuant to plea agreements, I would vacate and remand for a new trial. By rejecting the Government’s concession that constitutional error occurred here, and thereby refusing to apply, the only applicable harmlessness standard, the majority affirms the conviction because there was sufficient evidence to support it.
It errs in doing so. I respectfully dissent.

. According to the testimony of four drug dealers testifying pursuant to plea agreements, Garcia-Lagunas sold them, in the aggregate, at least 39 kilos of cocaine, with each kilo of cocaine valuing approximately $30,000 to $32,000 during the relevant time frame. J.A. 205, 208, 239, 340-42, 360-61, 388.

. As my colleagues in the majority point out, Garcia-Lagunas has resided in the United States since he was a teenager, and the majority of his family, including his parents, spouse, and two of his children, also live in the United States, making it improbable that he was sending large amounts of money back to family in Mexico.

. The majority suggests that the trial judge’s statements could not have independently affected the jury because they were voiced during a bench conference. To the contrary, I note that, as Juror Number 2 in a recent state criminal trial (and based on the "white noise’’ used in my courtroom when I served as a federal district judge), statements made during bench conferences, whether conducted under the hopeful veil of "white noise” or not, often remain within earshot of nearby and attentive jurors. There is nothing in the record here to suggest that the judge’s remarks went unheard in this instance.