2019 UT App 72

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
REYFUS MELLOW GRAVES,
Appellant.

Opinion
No. 20171023-CA
Filed May 2, 2019

Seventh District Court, Castle Dale Department
The Honorable Douglas B. Thomas
No. 161700030

Mark H. Tanner, Attorney for Appellant

Sean D. Reyes, Jeanne B. Inouye, and Karen A.
Klucznik, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1     In the culmination of a months-long feud, Reyfus Mellow Graves shot at two other men as they arrived at his friend's apartment complex. Witnesses heard Graves—who hails from Puerto Rico—make the following exclamation as he fired his weapon: "This is how we do it in Puerto Rico!" The State charged Graves with (among other crimes) attempted murder. At the trial, the prosecutor asked several witnesses about Graves's exclamation and also made mention of it during closing argument. At the conclusion of the trial, the jury found Graves guilty. Although Graves did not object on racial or constitutional grounds to any of the State's questions and comments about Puerto Rico, and indeed brought up the subject himself on a number of occasions during trial, Graves now complains that the

repeated references to Puerto Rico in a trial set in Emery County, Utah, imbued the proceeding with improper implications of racism and prevented him from receiving a fair trial. After reviewing the record in this case, including the entire trial transcript, we are unpersuaded by Graves's arguments, and therefore affirm his convictions.

BACKGROUND

¶2     On the afternoon of April 14, 2016, trouble was brewing in Ferron, Utah, as a string of profane text messages flew back and forth between and among four adult men: Graves, JH, ES and SO. The dispute appears to have originated from discussion of a woman (Girlfriend) who was at the time dating and living with Graves, but who had previously dated both JH and ES, and had also once lived in the same apartment as SO. As the texts were going back and forth, Graves, who had moved to Ferron just three months prior, was at ES's residence having a beer after work, and SO and JH were together at a different location. Graves and SO had never gotten along, though the reason for the bad blood between them is unclear from the record.

¶3     As the text exchange escalated, someone using ES's phone wrote "You want war[,] let's do war," to which JH replied, "Ok me and [SO] is down . . . . Where at [a]nd when[?]" A few minutes later, SO messaged ES that he was "on [his way] to [ES's] place." SO then apparently called ES's phone, which Graves answered. Profanity-laced threats ensued from both men. At this point, JH and SO borrowed a car from a neighbor and drove to ES's place, bringing JH's minor brother (Brother) along "for a witness."

¶4     In front of ES's apartment, Graves and ES were sitting in ES's Ford Bronco smoking cigarettes and drinking beer, since ES did not like people to smoke in his apartment. When JH and SO pulled up to the apartment complex, Graves got out of the

Bronco and fired three shots from a .22 caliber revolver (that belonged to ES) at least roughly in the direction of JH and SO as they exited the vehicle. The bullets did not hit anyone. Several witnesses would later testify that, as he was firing, Graves rotated the gun sideways and yelled something to the effect of "This is how we do it in Puerto Rico!" Graves denied making any such statement.

¶5     When the shooting started, JH moved in front of Brother, who had stayed in the car and ducked below the window. SO took cover behind the car, but began taunting Graves with insults and racial slurs. Graves continued to point the gun at SO until ES approached Graves and took the gun from him. ES then took the gun into his apartment and hid it under a pillow on his couch. Once Graves was disarmed, SO ran up to him and started to pummel him with his fists, continuing to punch him even after he felt Graves go limp. At some point, JH joined the fray and held Graves against a wall as SO continued to beat him.

¶6     The scuffle was eventually interrupted by an off-duty highway patrol trooper (Trooper), who happened to live down the street and responded after hearing the sound of gunfire in his neighborhood and observing a man pointing what looked like a gun. After calling the matter in to dispatch, Trooper drove his unmarked police vehicle to the apartment complex, drew his service weapon, and ordered all of the men to get on the ground. The men complied, and either JH or SO told Trooper that Graves had been shooting at them. Based on this information, Trooper used the single pair of cuffs in his possession to handcuff Graves. Trooper searched Graves, but found no gun and therefore ordered everyone on the scene to stay in place until backup arrived. At some point, ES explained that the gun was in his apartment. After additional law enforcement officers arrived at the scene, they confirmed that the gun was indeed where ES claimed it was, and secured his apartment until they procured a search warrant.

¶7     Graves, ES, JH, and SO were all arrested, taken into custody, and questioned independently that night. Brother also provided a statement to officers before leaving the scene. A detective (Detective) from the Emery County Sheriff's Office collected evidence from the scene, taking pictures of where it appeared that bullets had struck a nearby residence and the car that JH and SO had been driving. Detective examined the revolver recovered from ES's apartment and found that it contained three spent rounds and six unspent rounds. Detective also interviewed three additional witnesses, including one of ES's neighbors (Neighbor).

¶8     The State charged Graves with two counts of attempted murder and two counts of felony discharge of a firearm, but after pretrial proceedings one of the attempted murder counts was changed to a charge of reckless endangerment. Graves eventually stood trial for one count of attempted murder, two counts of felony discharge of a firearm, and one count of reckless endangerment.

¶9     At trial the prosecution called Trooper, ES, JH, Brother, SO, the officer (Officer) who transported ES to jail after the incident, Detective, and Neighbor. The State's case focused on the text messages exchanged on the day of the shooting as well as on Graves's actions immediately before and during the shooting. In his opening statement, the prosecutor described the shooting as well as Graves's alleged statement:

> At that point, there hadn't been any words exchanged between them, but one thing that had been said that [ES] will tell you is that when the defendant got out of the Bronco, he said, "I'll show you how we do things in Puerto Rico."
>
> The defendant is from Puerto Rico. He had pulled his gun out, he held it an angle—not straight up but at an angle—and fired at least the first shot that

way. We don't know exactly where those shots
went, in what order. We know there were a total of
three shots that were fired out of that .22.

¶10 During trial, the prosecution asked ES, JH, and SO—but
not Brother, Neighbor, or Trooper—whether they had heard
Graves say anything about Puerto Rico.[1] JH and SO both testified
that Graves shouted something to the effect of "this is how we
do it in Puerto Rico" or "that's how they do [it] in Puerto Rico."
However, ES testified that he never heard Graves say anything
about Puerto Rico that night. The prosecution pressed ES on this
point, and after ES testified, called Officer to the stand, who
testified that ES had told her, as she transported him to jail on
the night of the incident, that Graves said something to the effect
of "I'll show you how we do it in Puerto Rico." At this point,
defense counsel lodged a hearsay objection to the admission of
Officer's statement about what ES had told her while being
transported to jail, but the trial court overruled the objection.

¶11 The State drew out other details of the shooting during its
case-in-chief. ES testified that Graves had obtained his gun
surreptitiously, after asking to see the gun while they were in the
apartment. Further, the State asked JH, Brother, and SO whether
Graves held the gun sideways or upright during the shooting.

---

1. The State did ask Neighbor if she had been able to "hear
anything that was being said" during the incident, but the State's
questioning did not reference any specific statement. When
Neighbor answered that she had not been able to hear any
statements, the State moved on to another line of questioning.
Similarly, the State asked Brother questions about what he saw
and heard on the night in question, but asked no specific
question about the "Puerto Rico" statement; on cross-
examination, however, defense counsel specifically asked
Brother whether he had heard Graves make a statement about
Puerto Rico as he fired, and Brother answered in the negative.

These witnesses all testified that Graves held the gun sideways, or (in Brother's words) "like how gangs . . . do it." JH and SO testified that Graves pointed the gun directly at them as he shot and continued to aim the gun at SO afterward. Trooper and Neighbor both testified that they saw Graves pointing the gun at SO, though neither saw the shooting.

¶12 ES, JH, and SO also testified about the ongoing dispute between SO and Graves. ES and JH testified that the dispute was driven by SO, and began after Girlfriend evicted SO from her apartment and started a relationship with Graves. They further testified that SO had made several public threats to Graves, sometimes threatening to kill Graves and his family, though no one appears to have taken these threats seriously. For his part, SO testified that he never threatened Graves and that Graves had started the quarrel between them.

¶13 The State also called Detective, who testified that it appeared to him that a bullet had struck the vehicle driven by JH, although the bullet had not penetrated the vehicle. Though Detective was, by his own admission, "by no means an expert," he testified that it appeared to him that the mark was made by a small caliber bullet, such as a .22. Detective also testified that he observed what appeared to be a fresh bullet hole in a house across the street from the apartment complex, again consistent with a .22 caliber bullet.

¶14 During the defense's case, Graves testified in his own defense, and disputed several parts of the State's version of events. Graves testified that ES handed him the gun as JH and SO arrived; that he fired into the air twice and into the ground once and that he never intended to actually hit anyone; that he fired the gun in self-defense; that he never made a statement about Puerto Rico on the night of the shooting; that he held the gun "straight" and not sideways; and that he had never shot a gun prior to that night. The defense also obtained the court's permission to have Graves's mother testify telephonically from

Puerto Rico. At the outset of her testimony, defense counsel asked her where she was testifying from, and she answered that she was in Puerto Rico and that she had lived there for many years. She also testified that SO had once threatened her with a pistol when she was visiting Graves in Utah.

¶15   During closing argument, the prosecutor argued that Graves could not claim self-defense because the whole altercation was combat by agreement, and Graves had "brought a gun to a fistfight."[2] The State also argued that Graves's alleged statement about Puerto Rico was probative of his intent to actually shoot JH and SO, and told the jury that "[i]f you believe that he said, 'This is how we do it in Puerto Rico,' he cannot claim justification. He cannot claim . . . anything but a consensual altercation there." Further, the prosecutor told the jurors that they should not take seriously any possible threats made by SO to Graves because "[t]hat's the way these people talk," and that the standard was "what would a reasonable person do under the circumstance, not the culture that these people live in."[3] In its closing, the defense countered by pointing

---

2. *See* Utah Code Ann. § 76-2-402(2)(a)(iii) (LexisNexis 2017) ("A person is not justified in using force . . . if the person . . . was engaged in a combat by agreement . . . .").

3. It is unclear whether the prosecutor meant to use "these people" in a racially charged way (both SO and Graves were part of Emery County's small non-white population), or if he meant it to refer to all four men involved in the altercation (the prosecutor had also asked JH—who is white—if racial slurs and threats were "just common talk" "in this culture that you're in"). Either way, Graves did not object to this language at trial, nor did he raise it as an issue in his opening brief, and we therefore decline to address it further. *See Rodriguez v. Kroger Co.*, 2018 UT 25, ¶ 31 n.8, 422 P.3d 815 ("Issues not raised in an opening brief are waived.").

to the inconsistencies in the witnesses' testimony, the fact that no bullets had been recovered to conclusively link the bullet holes or marks to the gun Graves used, and the fact that Graves insisted he fired in the air because he was scared. The jury found Graves guilty on all four charges, and Graves now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶16 Graves presents two issues for our review. First, he argues that his constitutional rights to due process and equal protection were violated at trial due to racial prejudice. "Constitutional issues . . . are questions of law that we review for correctness." *State v. Martinez*, 2013 UT 23, ¶ 6, 304 P.3d 54 (quotation simplified).

¶17 Second, Graves argues that his conviction for attempted murder was not supported by sufficient evidence. When we consider an insufficiency of the evidence claim, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (quotation simplified). "We may reverse a verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (quotation simplified).

¶18 Neither of these issues was preserved at the trial level, and we therefore review them both for plain error.[4] *See State v.*

---

4. Graves argues that both issues were preserved at trial. In order for an issue to be preserved for appeal, "(1) the issue must be raised in a timely fashion; (2) the issue must be specifically raised; and (3) a party must introduce supporting evidence or relevant legal authority." *State v. Moa*, 2012 UT 28, ¶ 23, 282 P.3d

(continued…)

*Ringstad*, 2018 UT App 66, ¶ 32, 424 P.3d 1052. The plain error standard requires an appellant to show that "(1) an error exists; (2) the error should have been obvious to the [trial] court; and (3) absent the error, there is a reasonable likelihood of a more favorable outcome." *State v. Robinson*, 2018 UT App 227, ¶ 25 (quotation simplified).

ANALYSIS

¶19 The United States Constitution requires that all persons, regardless of race, "shall stand equal before the laws of the States." *Strauder v. West Virginia*, 100 U.S. 303, 307 (1879), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522 (1975). "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). "Appeals to racial passion can distort the search for truth and drastically affect a juror's impartiality," *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir.

---

(…continued)

985 (quotation simplified). Our review of the record reveals that Graves did not ever raise any constitutional issue before the trial court. Graves argues that he objected during the testimony of Officer, but this objection was specifically based on the hearsay aspect of that particular declarant's testimony. At no point during the trial did Graves object to any of the State's other numerous mentions of Puerto Rico, and at no point did Graves raise any objection related to racial bias or unconstitutionality.

As to the sufficiency of the evidence claim, Graves argues that it was preserved by his motion to reduce his offense pursuant to Utah Code section 76-3-402. But that statute, while it requires a court to consider "the nature and circumstances of the offense," Utah Code Ann. § 76-3-402(1) (LexisNexis 2017), does not concern itself with the sufficiency of evidence, and therefore does not specifically implicate that issue.

1990), and therefore "[t]he Constitution prohibits racially biased prosecutorial arguments," *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987).

¶20    But it does not follow from these unassailable principles that any mention of a litigant's race or ethnicity[5] is always constitutionally impermissible. In certain instances, references to race "pose[] no threat to [the] purity of the trial." *Doe*, 903 F.2d at 25. Race or ethnicity may be, for instance, a critical piece of the identification of a suspect or a victim, and the mention of race or ethnicity in such fact-based contexts does not violate a defendant's rights. *Id.* at 26. Yet, a trial can be rendered constitutionally unsound by even one statement inappropriately appealing to racial prejudice or emotion. *See id.* (stating that even a "brief . . . use of race" in a non-fact-based way "as a factor in closing argument is improper" (quotation simplified)). "The line of demarcation" between permissible and impermissible invocations of race "is crossed . . . when the argument shifts its emphasis from evidence to emotion." *Id.* at 25. On the one hand, evidence-based "unembellished reference[s]" to race or ethnicity "pose[] no threat to [the] purity of the trial." *Id.* On the other hand, emotion-based invocation of race, in an attempt to tap into

---

5. We recognize that race, ethnicity, and ancestry are overlapping and fluid concepts, especially in relation to the terms "Hispanic" and "Latino." *See, e.g.*, *Hispanic Origin*, United States Census Bureau, https://www.census.gov/topics/populatio n/hispanic-origin.html [https://perma.cc/6JUF-3V27] ("Hispanic origin can be viewed as the heritage, nationality, lineage, or country of birth of the person or the person's parents or ancestors before arriving in the United States. People who identify as Hispanic, Latino, or Spanish may be any race."). From a constitutional standpoint, "it matters not whether [a] reference is to race, ancestry or ethnic background." *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990).

the potential or perceived racial bias of jurors, is "beyond the pale of legally acceptable modes of proof." *Id.*

¶21 In this case, Graves argues that, during the trial, the State violated his constitutional rights by "repeatedly" referring to his Puerto Rican heritage. Indeed, Graves asserts that his ethnicity was mentioned 57 times" during the two-day trial, including "48 times the second day."[6] Graves concludes therefrom that his trial was irretrievably tainted by racist implications, and that his constitutional right to a fair trial was violated.

¶22 In response, the State makes two basic points, both of which are sound. First, the State notes that each of the references to Puerto Rico was, viewed individually, either entirely innocuous; brought up by Graves himself; or related to the statement Graves was alleged to have made at the time of the shooting, which statement the State maintains has probative value in establishing Graves's intent at the time he fired the gun. That is, the State contends—and Graves does not specifically contest—that each of the individual references to Puerto Rico was evidence-based rather than emotion-based. Second, the State correctly points out that Graves failed to object to any of the multiple references to Puerto Rico on the ground that they were racially motivated or that they deprived Graves of a fair trial for racial reasons, and argues that Graves has fallen short of demonstrating that the trial court committed plain error.

¶23 As noted above, in order to show that the trial court plainly erred, Graves must demonstrate that "(1) an error exists; (2) the error should have been obvious to the [trial] court; and (3) absent the error, there is a reasonable likelihood of a more

---

6. While the State takes issue with Graves's count of the number of times "Puerto Rico" was mentioned, and pegs the total number at fifty-one rather than fifty-seven, there is no doubt that Puerto Rico was discussed often during the trial.

favorable outcome," i.e., that the error was harmful. *State v. Robinson*, 2018 UT App 227, ¶ 25 (quotation simplified). Graves cannot satisfy this standard in this case.

¶24 First, Graves fails to convince us that any error occurred with respect to the number of times Puerto Rico was mentioned at trial. *See McCleskey*, 481 U.S. at 309 n.30; *see also Doe*, 903 F.2d at 25. Graves makes no effort to identify any individual comment or question by the prosecutor that amounts to an appeal to racial passion. To be sure, the prosecutor asked multiple witnesses about Graves's alleged statement, and mentioned it again during closing argument. But Graves denied making the statement, and by asking about it the prosecutor demonstrated that two witnesses had been consistent in their recollection of it, that one witness was inconsistent in his recollection of it, and that Graves denied it altogether. These types of questions did not violate Graves's constitutional rights, since "unembellished reference[s] to evidence of race . . . pose[] no threat to [the] purity of the trial." *Doe*, 903 F.2d at 25. In the end, Graves has simply failed to demonstrate that the State's questioning about this issue was excessive, or that any individual reference to Puerto Rico was, standing alone, emotion-based rather than evidence-based.[7]

¶25 Graves's argument is further undermined by the fact that at least twenty of the references to Puerto Rico were introduced by the defense or defense witnesses. Graves's mother—a defense witness—mentioned Puerto Rico four times during her testimony, and Graves's attorney even specifically asked her, "How long have you lived in Puerto Rico?" and "Have you ever

---

7. As further indication of the State's evidence-based (rather than emotion-based) reasons for asking about Puerto Rico, it is worth noting that the prosecution resisted any temptation to ask Brother, Neighbor, or Trooper about Graves's alleged statement, even though it might have had valid grounds to do so.

left Puerto Rico?" Graves testified in his own defense, and he and his attorney mentioned Puerto Rico nine times during Graves's own direct examination. Defense counsel also repeated Graves's alleged statement about Puerto Rico three times while cross-examining some of the State's witnesses, and mentioned the statement himself twice during closing argument.

¶26    In addition, several other references to Puerto Rico came from witnesses, rather than at the instance of the prosecutor, and Graves directs us to no case law in which a reference to race or ancestry made by a witness—rather than by the State—was held to be constitutional error. Indeed, in *Doe,* the racially-based evidence given by a detective, some of which had been elicited during questioning by the government, was analyzed and excluded under rules 402 and 403 of the Federal Rules of Evidence, not the Constitution, even while the racially-based remarks made by the prosecutor that relied on the very same evidence were analyzed and excluded on constitutional grounds. 903 F.2d at 19–28.

¶27    Furthermore, Graves acknowledged at oral argument that the trial court properly allowed into evidence at least *some* references to Graves's Puerto Rican heritage, including references to the statement Graves was alleged to have made while firing the gun, and made clear that he does not take the position that the trial court was under an obligation, on the facts of this case, to scrub the trial clean of all references to Puerto Rico. Instead, Graves asserts that "at some point" the cumulative effect of the repeated references to Puerto Rico became error. By conceding that at least some of the references are permissible, and by failing to identify any of the specific references as emotion-based rather than evidence-based, Graves is effectively acknowledging that the State's individual references to Puerto Rico were the type of "unembellished reference" to ancestry that is not constitutionally forbidden, since even a single appeal to race-based emotion would be impermissible. *See id.* at 25.

¶28    While we certainly leave open the possibility that, in a different case, repeated and gratuitous references to race (even in an evidence-based context) might be employed for an improper racially-motivated purpose,[8] Graves has not persuaded us that any such thing happened here. As an initial matter, Graves does not identify any specific juncture in the trial, activated by any specific comment or question by the State, at which he believes the references crossed the line from individually permissible to cumulatively impermissible. He merely asserts that this must have happened "at some point." Without more assistance from Graves on this point, we have a hard time discerning any reason to vary our usual rule that a series of non-errors cannot amount to cumulative error. *Cf. State v. King*, 2017 UT App 43, ¶ 38, 392 P.3d 997 ("Because we have identified no errors . . . it follows that there can be no prejudice resulting from multiple errors for us to consider cumulatively."). In the end, our review of the trial transcript leaves us unconvinced that the references to Graves's Puerto Rican heritage were constitutionally impermissible.

¶29    Next, even if we were to adopt Graves's position that a large enough number of individually-permissible fact-based references to race can at some point become unconstitutional simply by sheer force of repetition, he would still not prevail here, because any error, in order to constitute plain error, must have been obvious to the trial court. "To establish that the error should have been obvious to the trial court, the appellant must show that the law governing the error was clear at the time the alleged error was made." *State v. Ringstad*, 2018 UT App 66, ¶ 79, 424 P.3d 1052 (quotation simplified). "An error is not obvious if

---

8. We also note that repeated comments or questions quickly lose their probative value, and would be ripe for an objection—pursuant to rule 403 of the Utah Rules of Evidence—that the comments are cumulative, are a waste of time, or have little probative value compared to their potentially prejudicial effect. In this case, however, Graves lodged no such objection.

there is no settled appellate law to guide the trial court." *Id.* (quotation simplified). We are aware of no case, and Graves directs us to none, espousing the principle he now advocates.

¶30 Graves argues that it is clear from cases such as *McCleskey* that the Constitution protects defendants from the "introduction of racial prejudices at trial." Graves correctly points out that *McCleskey* stands for the proposition that judges must "engage[] in unceasing efforts to eradicate racial prejudice from our criminal justice system." 481 U.S. at 309 (quotation simplified). But *McCleskey* also recognizes that, in all cases, there exists the risk that racial or "other kinds of prejudice" might influence the trial, *id.* at 308, and that, "[d]espite these imperfections, our consistent rule has been that constitutional guarantees are met when the mode for determining guilt or punishment itself has been surrounded with safeguards to make it as fair as possible," *id.* at 313 (quotation simplified). Indeed, no court of which we are aware has placed a limit on the number of times a prosecutor may make individually-permissible, evidence-based references to race during a trial. *See generally Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867–68 (2017) (listing safeguards "enforc[ing] the Constitution's guarantee against state-sponsored racial discrimination," which list does not include any limits on the number of times a prosecutor may mention race); *McCleskey*, 481 U.S. at 309 n.30 (same). Because there was no clear appellate law stating that repeated permissible references to race or ethnicity can amount to cumulative constitutional error, we cannot conclude that Graves's alleged error would have been obvious to the trial court from a legal standpoint. In addition, from a factual standpoint, we are unconvinced after reviewing the trial transcript that there was any point at which it should have become obvious to the judge that the trial had become irretrievably infected by the introduction of race-based evidence or argument.

¶31 Finally, Graves argues that his conviction is not supported by sufficient evidence. In considering "an

insufficiency of the evidence claim, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (quotation simplified). "We may reverse a verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (quotation simplified). Graves points to the fact that law enforcement did not conclusively link the gun Graves used to either the mark on the car or the hole in the neighbor's house, and to conflicts in the testimonies of the various witnesses. But the two witnesses who saw the events best both testified that Graves shot at them, not into the air, and other witnesses testified that they saw Graves pointing the gun in the direction of SO for at least part of the altercation. The identity of the gun was never in issue, and Detective testified that the mark on the car and the hole found in the neighbor's house were consistent with the caliber of the gun Graves used. This evidence is neither inconclusive nor improbable, especially when viewed "in the light most favorable to the verdict of the jury," *id.* (quotation simplified), and we therefore conclude that there was sufficient evidence to support Graves's conviction.

CONCLUSION

¶32 We have reviewed the trial transcript and other relevant portions of the record and are unconvinced that Graves's trial was impermissibly infected by racial prejudice. Graves has not shown how or where the prosecutor's references to Puerto Rico during trial became constitutionally forbidden appeals to racial bias, or at what point this would have become an obvious error. Nor has Graves shown how the evidence presented at trial was inherently improbable or insufficient to support his convictions.

¶33 Affirmed.

_____