2020 UT App 3

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STEVEN DENNIS SKINNER,
Appellant.

Opinion
No. 20180584-CA
Filed January 3, 2020

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 141907373

Debra M. Nelson and Brady Smith, Attorneys
for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 Seeking a "dominant/submissive" experience, Steven Dennis Skinner summoned a professional escort to his apartment in the wee hours of the morning. When the escort objected to some of the acts in which Skinner wanted her to participate, he produced a gun and forced her to perform sexual acts to which she had not consented. Eventually, the two of them fought over the gun, and it discharged, hitting the escort and injuring her; in the resulting confusion, the escort somehow gained control of the gun and shot Skinner several times, injuring him. A jury later convicted Skinner on four counts of aggravated sexual assault, as well as one count of theft by

receiving stolen property. Skinner appeals, arguing that the evidence was insufficient to convict him of any offense. We reject Skinner's arguments and affirm his convictions.

BACKGROUND[1]

¶2      In 2014, V.M. worked as an escort for a business known as the Dollhouse. Clients seeking the services of an escort contact the Dollhouse, and the company's phone operator—a sort of dispatcher—then contacts the individual escorts and tells them the identity of the client and where to meet. At approximately 3:00 a.m. one morning, the Dollhouse phone operator contacted V.M. and told her that a client, Skinner, had requested a "submissive person" and that he wanted "some sort of dominating" experience. V.M. drove to the address the phone operator had provided, which turned out to be Skinner's apartment. Skinner met her at her car and escorted her inside, at which point V.M. collected a $200 "show-up" fee, by which Skinner purchased one hour of V.M.'s time. At that point, pursuant to company protocol, V.M. called the phone operator and reported that she was in the apartment and had collected the "show-up" fee, and that the clock could start on Skinner's hour.

¶3      V.M. had to give half of the "show-up" fee to the Dollhouse, but was entitled to keep the other half, plus any tips the client might provide. V.M. told Skinner that, for a tip, she would be "more entertaining." In response, Skinner stated that

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Tulley*, 2018 UT 35, ¶ 4 n.1, 428 P.3d 1005 (quotation simplified).

"he likes whips and cuffs and stuff." Because V.M. was "trying to get the money," she did not immediately reject Skinner's suggestions, instead saying "we'll see." Skinner paid V.M. an additional $200 tip, and V.M. then took off her clothes, leaving on only her bra and underwear. Soon thereafter, Skinner produced a whip and told V.M. that he wanted to use it on her; after expressing initial objections, V.M. agreed to let Skinner use the whip, but only if Skinner used it "really lightly." As Skinner whipped V.M., he instructed her to call him "sir." At some point, the whipping became too hard for V.M.'s liking, and she asked Skinner to stop. Skinner complied, but became frustrated that V.M. would "not agree[] to do what he want[ed]." Skinner then went into a back room, leaving V.M. alone in the living room.

¶4 After sitting alone for a few minutes in the living room, V.M. became worried that Skinner had been gone for "too long," so she walked toward the back room to "see what was going on." From the doorway to the room, V.M. observed Skinner "facing the wall" and "[s]taring down, looking at something." Concerned that Skinner "looked really odd and suspicious," V.M. decided to text the Dollhouse phone operator to inform her that Skinner was "acting a little bit odd," and she returned to the living room to retrieve her phone, which was in her purse on the couch. But before V.M. could send the message, Skinner appeared behind her, wielding a "long" handgun. Skinner held the gun to the back of V.M.'s head and knocked the phone out of her hand, causing it to land between the wall and the couch. With the gun still against V.M.'s head, Skinner told her that she was "going to do what the f*** I say"; he then forced V.M. to "get down on [her] knees" and perform oral sex on him, even though V.M. testified that she had not agreed to do so. Skinner forced V.M. to continue until Skinner ejaculated in her mouth.

¶5 After that, Skinner continued to demand that V.M. perform various sex acts, including anal sex, and ordered her to "bend over on the couch" with her back to him while he

"rubb[ed]" and "push[ed]" himself against her in an attempt to insert his penis into her anus. Skinner also inserted his fingers into V.M.'s anus and rubbed his penis against her vagina. But Skinner was unable to maintain an erection, so he ordered V.M. to "get him hard again" by performing additional oral sex. Skinner continued this "back and forth"—with V.M. performing oral sex followed by unsuccessful attempts to perform anal sex— for what seemed to V.M. like "a long time."

¶6      Eventually Skinner grew tired of this routine, and placed the gun down on the couch. With V.M. still bent over facing the couch and Skinner behind her with his stomach against her back, Skinner wrapped his left arm around V.M.'s neck and began to choke her. As V.M. began to black out, she reached for the gun. At that point, Skinner went for the gun as well, and "a little tussle" ensued. The gun went off twice, hitting V.M. both times: once in her left leg, where the bullet entered the outside of her calf and exited on the inside of her knee; and once in her left hand, where the bullet entered her palm and exited the top of her hand. Despite having been shot, V.M. continued to struggle with Skinner until she gained control of the gun. Then, using her right hand, V.M. shot at Skinner "as many times" as she could, hitting him three times: once in his left abdomen, once in his left upper arm, and once on his right inner thigh.

¶7      After shooting Skinner, V.M. "picked up [her] leg," which was "hanging off" with "the bone coming out," and dragged herself out of the apartment. Once outside, V.M. continued to drag herself down the outside stairs, all the while "yelling for help." A neighbor responded to her pleas and called the police and paramedics.

¶8      When officers arrived at Skinner's apartment complex, they found the neighbor sitting with V.M., who was lying at the bottom of the stairs to the apartment. V.M. was "naked for the most part," covered in blood, and "screaming that she had been

shot." V.M. told officers that a man upstairs had a gun. Officers noticed that there was "quite a bit of blood on the stairs" so they followed its trail, which led to Skinner's apartment. Officers found the door to the apartment open and, through the door, saw Skinner lying across a chair naked and covered in blood, with multiple gunshot wounds. When asked about the gun, Skinner told officers, "[I]t's her gun, she brought it."

¶9     V.M. and Skinner were taken to a hospital where they both underwent surgeries to treat their gunshot wounds. V.M. suffered fractures to her femur, tibia, and left hand, and has required multiple reconstructive surgeries. Skinner suffered injuries to his colon, diaphragm, liver, ribs, and left arm.

¶10    During a search of Skinner's apartment, which was in complete "disarray," officers found three bullet holes: one in the wall above the television, one in the window, and one in the wall by the couch. There were copious amounts of blood throughout the apartment, including "a lot of blood from the kitchen"; blood on the couch; a blood trail from the front door into the apartment; and a pool of blood just inside the front door. Although there were blood stains on the exterior side of the front door, there were no visible stains on the interior of the door, and neither the doorknob nor the dead bolt on the door was tested for blood. There were also blood spatter stains on "the wall directly behind the couch, the wall on the side of the couch, and the ceiling." Tissue was found on the walls, ceiling, and bookshelf. A crime scene technician took blood swabs from the areas that were "the most saturated with blood," but unfortunately the swabs became contaminated before they could be tested for DNA. No tissue was collected for DNA testing.

¶11    Officers recovered a gun from the front room, and located two gun cases in the back room. One of the cases was empty and was made for a Ruger GP100 357 magnum revolver—the same brand and make of gun found in the front room. Subsequent

investigation indicated that this firearm did not belong to Skinner and had been reported stolen.

¶12 After completing its investigation, the State charged Skinner with four counts of aggravated sexual assault, one count of theft by receiving stolen property for possessing the gun, and one count of aggravated assault. On the State's motion, the aggravated assault charge was eventually dismissed, and Skinner was tried before a jury on the remaining five counts.

¶13 At trial, the State introduced test results that showed Skinner's DNA and amylase (saliva) on V.M. Her oral and perianal swabs tested positive for seminal fluid and her breast swabs tested positive for saliva, all of which contained DNA consistent with Skinner's. Skinner's penile swabs tested positive for saliva and DNA consistent with V.M.'s. Also, the gun's owner (Owner) testified, and explained that he knew Skinner because his mother (Mother) was friends with Skinner and had invited Skinner to live at her house for a time. Owner testified that the Ruger revolver recovered at the scene belonged to him, and had been gifted to him by Mother. Although Owner did not live with Mother when Skinner was there, Owner left many of his belongings at her house, including the gun. About a month after Skinner moved out, Owner noticed that his gun was missing, and he called the police and reported it stolen, identifying the gun by its serial number. Owner maintained that he had never given Skinner permission to keep the gun or even take it from Mother's house.

¶14 The defense called two witnesses: a police officer (Sergeant) and a forensic expert (Expert). Sergeant testified that he had been undercover in a previous prostitution sting in which V.M. had offered to masturbate him for $200. Expert opined extensively on the physical evidence in the case, specifically on V.M.'s and Skinner's relative positions during the shooting and "the events immediately surrounding the gunshots." After

reviewing (among other things) crime scene photographs, police reports, lab and medical reports, and transcripts of the preliminary hearing, Expert testified that he did not see evidence consistent with "what [he] would expect from [V.M.'s] description" of the shooting. Expert first testified about the shot to V.M.'s leg. Expert explained that if V.M. had been shot in the leg while kneeling on the couch—as she had testified—there would likely be "a good deal more blood on the couch," including blood spray in an exit gunshot pattern.

¶15    Expert also noted three issues with V.M.'s account of her and Skinner's relative positions during the shooting. First, if V.M.'s knee had been on the couch when the gun went off, "there's no place to put the gun and aim it the way that it goes through her leg. The couch gets in the way." Second, if Skinner had been behind V.M. holding the gun in his right hand and "aiming so that he's shooting . . . [V.M.] in the back of her calf," Skinner would have also been pointing the gun at himself. Third, if V.M.'s leg had been shot while she was kneeling on the couch, "the exit injury to her thigh would've also potentially resulted in the exit injury to her torso" because the gun would have been pointing upwards resulting in the bullet "coming out higher than it's going in on the leg."

¶16    Expert then testified about the shot to V.M.'s hand. Expert stated that the entry wound was on the inside of V.M.'s left palm and the exit wound was on the outside. He opined that V.M.'s hand "wouldn't have been functional" after it was shot. Expert then explained a number of issues surrounding the shooting that he had identified. First, if V.M. and Skinner had been positioned as V.M. described at the time of the shooting, the exit wound on the back of V.M.'s hand could only have occurred if her hand was "turned completely around." Second, the blood spatter evidence and the lack of bullet damage was not consistent with V.M.'s claim that she had been kneeling on the couch with Skinner behind her when he shot her hand. Specifically, there

was no blood spatter on the couch or the surrounding walls, nor was there any bullet damage to the couch or walls, as would be expected if V.M.'s version of events were true. Third, there was blood spatter evidence consistent with V.M.'s hand wound that was located "in the exact opposite direction of what [V.M.] had described in her testimony."

¶17 Lastly, Expert testified that the revolver in this case was relatively easy to discharge, requiring only three pounds of pressure. He also testified that it is difficult, "particularly in a situation where there's a lot of emotion" and stress, for a novice to shoot a handgun accurately. Furthermore, most individuals use two hands when shooting a handgun because doing so increases accuracy and provides stability when the gun recoils. As such, Expert concluded that the damage to V.M.'s left hand had in effect rendered it useless, and she would not have been able to use that hand to steady the gun or cock the hammer back.

¶18 At the close of the State's evidence Skinner made an oral motion for a directed verdict, arguing that the evidence presented was not sufficient for the jury to find Skinner guilty beyond a reasonable doubt. Skinner's argument was brief; he argued simply that the State's evidence was "solely based on testimony" from V.M., and noted that, while "some additional DNA evidence may or may not corroborate that testimony," it was insufficient to convict him "without additional forensic evidence" to support it. Skinner did not ask the trial court to disregard any evidence, and made no specific argument that V.M.'s—or any other witness's—testimony was inherently improbable. The trial court denied the motion, and the jury convicted Skinner on all counts.

ISSUES AND STANDARDS OF REVIEW

¶19 Skinner now appeals, asserting that there was insufficient evidence to support the jury's verdict on any of the counts. With

regard to the theft count, Skinner makes a traditional sufficiency-of-the-evidence argument, asserting that the State's evidence was insufficient to support his conviction. "When a jury verdict is challenged on the ground that the evidence is insufficient, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict." *State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503 (quotation simplified). After reviewing the evidence in this manner, "we will uphold the trial court's decision if . . . we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified).

¶20 With regard to the sexual assault counts, however, Skinner's argument is more nuanced. Rather than make a traditional sufficiency-of-the-evidence argument, Skinner asks us to disregard V.M.'s testimony as "inherently improbable," *see State v. Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 288, before assessing the sufficiency of the State's evidence on the sexual assault counts. We "accord deference to the trial court's ability and opportunity to evaluate credibility and demeanor," and therefore review deferentially a trial court's decision to decline to disregard a witness's testimony due to inherent improbability, reversing the trial court's decision only if it was "clearly erroneous." *Salt Lake City v. Northern*, 2013 UT App 299, ¶ 6, 318 P.3d 775 (quotation simplified).

ANALYSIS

I. The Sexual Assault Convictions

¶21 Skinner first raises an insufficiency-of-the-evidence challenge to his four convictions for aggravated sexual assault. His argument on appeal is a specific one: he asserts that his sexual assault convictions should be reversed because "the verdicts were based on testimony that was inherently

improbable." Citing *State v. Robbins*, 2009 UT 23, 210 P.3d 288, he contends that V.M.'s testimony—which provided the basis for the sexual assault convictions—"was materially inconsistent, patently false, and lacked corroboration with the forensic evidence at the scene."

¶22    Skinner maintains that he preserved this issue for appeal by making his general motion for a directed verdict at trial. In the alternative, in the event that we find the issue unpreserved, he asks us to review it for plain error. Accordingly, we begin our analysis by considering whether Skinner properly preserved this issue for appellate review.

A

¶23    Appellate courts "generally will not consider an issue unless it has been preserved for appeal." *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. "To preserve an issue for appeal, a party must present it to the trial court in such a way that the trial court has an opportunity to rule on that issue." *State v. Doyle*, 2018 UT App 239, ¶ 13, 437 P.3d 1266 (quotation simplified). Put differently, an issue is preserved "[w]hen the specific ground for an objection is clear from its context." *State v. Gonzalez*, 2015 UT 10, ¶ 26, 345 P.3d 1168. In the context at issue here, we have stated that a directed verdict motion that "makes general assertions but fails to assert the specific argument raised on appeal . . . is insufficient to preserve the more specific argument for appeal." *State v. Gallegos*, 2018 UT App 112, ¶ 14, 427 P.3d 578 (quotation simplified).

¶24    Moreover, we have recently noted that a claim—under *Robbins*—that a particular witness's testimony is inherently improbable is not the same as a claim that the State's evidence is insufficient. *See Doyle*, 2018 UT App 239, ¶¶ 12–19. Indeed, a *Robbins* claim is a unique thing. Ordinarily, courts are not "in the business of reassessing or reweighing evidence" already considered by a jury, and conflicts in the evidence are almost

always resolved "in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398. But our supreme court has carved out a narrow exception to this general rule, under which a court may choose to disregard a particular witness's testimony as "inherently improbable." *Robbins*, 2009 UT 23, ¶ 13. However, a trial court may do so "only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt." *Id.* ¶ 19. Moreover, "[t]he existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility." *Id.*; *see also Prater*, 2017 UT 13, ¶ 38 (explaining that the *Robbins* court, in disregarding testimony, relied on "the inconsistencies in the [witness's] testimony *plus* the patently false statements the [witness] made *plus* the lack of any corroboration").

¶25 A generalized challenge to the sufficiency of the State's evidence, by contrast, does not necessarily include an assertion that any particular witness's testimony is "inherently improbable." Indeed, we clarified in *Doyle* that a *Robbins* claim "may be a component of an insufficiency challenge, but not every insufficiency challenge raises a *Robbins* issue." *Doyle*, 2018 UT App 239, ¶ 19. After all, a defendant who raises a general sufficiency challenge asks a court to examine the evidence, including "all inferences that can be reasonably drawn from it," to determine if "some evidence exists" that could support the verdict. *See State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503 (quotation simplified). In conducting this inquiry, it is ordinarily not the court's place to disregard any particular items of admitted evidence; rather, a court should examine all admitted evidence to determine if "some evidence exists" that could support the verdict. *Id.* (quotation simplified); *see also State v. Salgado*, 2018 UT App 139, ¶ 37, 427 P.3d 1228 ("If there is *any* evidence, however slight or circumstantial, which tends to show guilt of the crime charged, the court must submit the case to the jury." (emphasis added) (quotation simplified)).

¶26 When making a *Robbins* claim, by contrast, a defendant raises a whole "new legal theory." *See Doyle*, 2018 UT App 239, ¶ 19. In a *Robbins* claim, a defendant specifically asks the court to disregard a particular witness's testimony as "inherently improbable." *Id.* (stating that the "new legal theory" inherent in a *Robbins* claim is that "the insufficiency should be reviewed only *after* [the targeted witness's] testimony is ignored as 'inherently improbable'"). Essentially, a defendant who raises a *Robbins* claim in the context of a directed verdict motion for insufficiency is asking the court, in conducting its sufficiency-of-the-evidence review, to examine only a particular subset of the admitted evidence, and to disregard certain witness testimony before undertaking that review. *See id.*

¶27 In *Doyle*, we held that the defendant had failed to preserve a *Robbins* claim for appellate review when he made only a general motion for directed verdict on insufficiency grounds, arguing that the evidence was "inconclusive and speculative." *Id.* ¶¶ 12–19. We noted that, at the trial court level, the defendant had not specifically asked the court to exclude or disregard any particular evidence, and that his effort to raise a *Robbins* claim on appeal went "far beyond what was argued in the motion for a directed verdict." *Id.* ¶ 19. We stated that the trial court, upon receiving a motion for directed verdict arguing insufficiency, would not have understood "from context" that the defendant was making a *Robbins* challenge. *Id.* We noted that, in the motion made at the trial court level, "[t]here was never any argument that [the witness's] testimony was so inherently improbable that it should be disregarded before analyzing the sufficiency of the State's evidence." *Id.* Under such circumstances, we deemed the defendant's *Robbins* claim unpreserved, and reviewed it only for plain error.

¶28 We discern no meaningful differences between the situation presented in *Doyle* and the situation presented here. Skinner's directed verdict motion, like the one made in *Doyle*,

was general, asserting that the evidence that the State presented was insufficient, but not asking that any particular testimony be disregarded as inherently improbable "before analyzing the sufficiency of the State's evidence." *See id.* Skinner argued simply that the State's case "was solely based" on V.M.'s testimony, which, while possibly corroborated by DNA evidence, was unsupported—and perhaps partially contradicted by—"forensic evidence." At no point did Skinner mention *Robbins* or any related case law, or give the trial court any other indication that he was raising a *Robbins* claim.[2]

¶29 On appeal, by contrast—apparently tacitly acknowledging that, if V.M.'s testimony is included in the calculus, sufficient evidence exists to support his convictions for aggravated sexual assault[3]—Skinner asks us to disregard V.M.'s

---

2. Skinner asserts that the trial court, in ruling on the directed verdict motion, recognized the motion as one grounded in *Robbins*, because the court mentioned that it was "following the caselaw regarding how the Court should go about doing this, and how the Court should view the evidence," and because it indicated that it was denying the motion because the State had "produced believable evidence of each and every element" of the offenses charged "from which a jury acting reasonably could find the defendant guilty." In our view, Skinner overreads these general statements from the trial court, which certainly do not leave us with the impression that the trial court believed it was ruling on a *Robbins* claim.

3. By making a general insufficiency argument before the trial court in connection with his directed verdict motion, Skinner preserved for appeal the issue of whether, considering *all* of the evidence presented at trial, sufficient evidence existed to support his convictions. However, Skinner does not press this issue on appeal, and instead argues solely that we should disregard

(continued…)

testimony as inherently improbable under *Robbins* before undertaking our assessment of the sufficiency of the State's evidence. But this issue—this "new legal theory," *see Doyle*, 2018 UT App 239, ¶ 19—was never raised before the trial court. As in *Doyle*, this theory "goes far beyond what was argued" in Skinner's motion for a directed verdict. *Id.* In arguing that V.M.'s testimony should be excluded as inherently improbable, Skinner is not merely asking us to find that the evidence presented was insufficient. Instead, he is asking us to disregard V.M.'s testimony in its entirety and then evaluate whether the State's evidence—without V.M.'s testimony—is sufficient to support a conviction. A defendant who wants a trial court to disregard a witness's testimony under *Robbins* before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue. Because Skinner did not ever make such a request to the trial court, he did not properly preserve it for our review on appeal. Accordingly, we review the issue only for plain error.

B

¶30   In order to demonstrate that a trial court committed plain error, an appellant must show that "(1) an error exists; (2) the error should have been obvious to the trial court; and (3) absent the error, there is a reasonable likelihood of a more favorable outcome." *State v. Graves*, 2019 UT App 72, ¶ 18, 442 P.3d 1228 (quotation simplified). In this context, where Skinner asserts that the trial court committed plain error in

---

(…continued)
V.M.'s testimony under *Robbins*, and only then consider the sufficiency of the State's evidence. Accordingly, we do not further address any issues regarding the general sufficiency of the State's evidence, when V.M.'s testimony is included.

failing to *sua sponte* disregard V.M.'s testimony as inherently improbable, Skinner must demonstrate not only that, had Skinner raised the issue below, it would have been error for the trial court to fail to disregard V.M.'s testimony, but also that V.M.'s testimony was so obviously and fundamentally faulty that the trial court should have stepped in and excluded that testimony from the equation without specifically being asked to do so. Skinner cannot make this showing here, because on these facts it would not have been error at all—let alone obvious error—to deny Skinner's *Robbins* motion even if it had been clearly and timely made.

¶31    In *Robbins*, our supreme court emphasized the narrowness of the exception it was announcing, and held that a court may "reevaluate the jury's credibility determinations" only where a witness presents testimony that is inherently improbable *and* there is no additional evidence of the defendant's guilt. *State v. Robbins*, 2009 UT 23, ¶ 19, 210 P.3d 288. In *Prater*, the court again examined the scope of the exception, recognizing that in *Robbins*, the witness's inconsistent testimony, standing alone, was not enough to allow the court to reassess the witness's credibility. *State v. Prater*, 2017 UT 13, ¶ 38, 392 P.3d 398. Rather, it "was the inconsistencies in the [witness's] testimony *plus* the patently false statements the [witness] made *plus* the lack of any corroboration." *Id.* More recently, we have emphasized that the *Robbins* exception is "narrow" and that "[i]t is difficult to successfully establish such a claim on appeal," *see State v. Cady*, 2018 UT App 8, ¶¶ 17–18, 414 P.3d 974; *see also State v. Rivera*, 2019 UT App 188, ¶ 23 n.6 (stating that "[a] case which actually falls within the *Robbins-Prater* rubric is exceedingly rare," and noting that "we have not found a single Utah decision examined under that rubric that has reversed a verdict since *Robbins*"), and that "*any* additional evidence supporting the verdict would preclude a judge from reconsidering a witness's credibility," *see Rivera*, 2019 UT App 188, ¶ 24. Thus, under

*Robbins* and *Prater*, an inherent improbability claim will necessarily fail where any evidence corroborates the witness's testimony.

¶32    In this case, V.M.'s overall account was at least partially corroborated by other evidence. For instance, DNA and saliva tests conclusively showed that there had been sexual contact between V.M. and Skinner. Specifically, V.M.'s oral and perianal swabs tested positive for seminal fluid and her breast swabs tested positive for saliva, all of which contained DNA consistent with Skinner's. Skinner's penile swabs also tested positive for saliva and DNA consistent with V.M.'s. In addition, V.M.'s wounds, and the copious blood found at the scene, corroborated her testimony that she had been shot. Thus, there exists evidence at least partially corroborating V.M.'s version of events.

¶33    Skinner argues, however, that the existing corroborating evidence does not go to the issue of whether the sexual acts were consensual, which is where this case's true fault line lies. As Skinner points out, the corroborating evidence bolsters other (less controversial) aspects of V.M.'s account—such as her claims that she had been shot, and that sexual contact occurred between her and Skinner—but does not necessarily back up her claim that she did not consent to sexual contact with Skinner.

¶34    But Skinner misses the point. Corroborating evidence sufficient to defeat a *Robbins* claim does not have to corroborate the witness's account across the board, in every particular. It just has to provide a second source of evidence for at least some of the details of the witness's story. *See Prater*, 2017 UT 13, ¶ 38 (stating that a "lack of *any* corroboration" is required to sustain a *Robbins* claim (emphasis added)); *see also Rivera*, 2019 UT App 188, ¶ 24 (stating that "*any* additional evidence supporting the verdict would preclude a judge from reconsidering a witness's credibility"). Indeed, in a very similar context, we have already

held that a *Robbins* claim fails when the witness's overall account is bolstered by other evidence, even if that other evidence does not shed light on whether the witness consented to sexual activity. *See State v. Crippen*, 2016 UT App 152, ¶¶ 15–16, 380 P.3d 18 (stating that, although the defendant's "statements during the jailhouse phone call" that he had engaged in sexual activity with the witness "were not evidence of a lack of consent, those statements do tend to corroborate [the witness's] overall account," and holding that the witness's testimony was therefore "not inherently improbable").[4] The corroborating evidence that exists here is enough to render Skinner's *Robbins* claim invalid.

¶35 While there were some inconsistencies between V.M's testimony and Expert's testimony, including blood spatter evidence and the positions of V.M. and Skinner during the shooting, it is ordinarily not the job of the court to decide whether V.M.'s testimony is believable. Indeed, "the jury was not obligated to believe [V.M.'s] account of events, and it was the jury's duty—not the appellate court's—to weigh that evidence and make a determination of fact." *See id.* ¶ 16 (quotation simplified). "Disregarding witness testimony" as inherently false or improbable "should be an uncommon course of action," which courts should take "only when the witness's credibility is so far impeached as to be unbelievable by a reasonable jury." *Id.* (quotation simplified). In this case, the trial

---

4. Indeed, by the same token, many of the inconsistencies Skinner sees in V.M.'s testimony—which mostly have to do with the details of the shooting—likewise do not directly bear on her claim that she did not consent to the sexual contact. Where Skinner mounts an argument for inherent improbability based upon tangential inconsistencies in V.M.'s overall story, the State is entitled to rebut that argument with evidence that corroborates other tangential elements of V.M.'s overall story.

court did not plainly err by allowing the jury to judge the competing witnesses' testimonies, and therefore did not plainly err by failing to *sua sponte* declare V.M's testimony inherently improbable.

## II. The Theft by Receiving Stolen Property Conviction

¶36    Next, Skinner argues that his conviction for theft by receiving stolen property should be reversed because the evidence was insufficient to prove his guilt. In making this argument, Skinner does not ask us to disregard the testimony of any witness as inherently improbable; instead, he makes the same general sufficiency-of-the-evidence argument he made to the trial court in connection with his directed verdict motion. Thus, this claim is preserved, and we review it accordingly. As noted above, we will uphold the trial court's denial of Skinner's motion if "we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503 (quotation simplified).

¶37    A person is guilty of theft by receiving stolen property if that person "receives, [or] retains . . . the property of another knowing that the property is stolen, or believing that the property is probably stolen," and intends "to deprive the owner" of it. Utah Code Ann. § 76-6-408(2) (LexisNexis Supp. 2019).[5] The State's argument, on this count, was that the gun Skinner used to confront V.M. actually belonged to Owner, and that Skinner intended to keep it for his own and did not have Owner's permission to possess it.

_____

5. Because there have been no material changes to the language of the statute since the time of the incident in question, for the sake of convenience we cite to the most recent version of the statute. *See State v. Lopez*, 2019 UT App 11, ¶ 25 n.3, 438 P.3d 950.

¶38     The State's position was supported by at least "some evidence." *See Hirschi*, 2007 UT App 255, ¶ 15 (quotation simplified). Indeed, Owner testified that the gun belonged to him but it had gone missing from Mother's house approximately one month after Skinner (who had temporarily been living at the house) moved out. Because Owner did not give anyone permission to move the gun, he promptly called police, provided them its serial number, and reported it stolen. After the shooting, police found a gun and matching case during a search of Skinner's apartment. The make and model matched that reported as stolen by Owner. But when questioned by the police, Skinner stated that V.M. had brought the gun to his apartment.

¶39     Skinner acknowledges Owner's testimony, but contends that it is not enough, by itself, to support the verdict, because the State did not present any evidence about whether Mother might have given Skinner permission to possess the gun. But Skinner does not argue, or even imply, that Mother's testimony would have differed in any material respect from Owner's. And more to the point, Owner's testimony is alone sufficient to support the conviction. He testified that Mother had gifted him the gun, and that therefore he—and not Mother—owned it, and that he had not given Skinner permission to possess it. While the State could have chosen to present evidence from other witnesses, including perhaps Mother, to buttress Owner's testimony, the fact that it chose not to do so does not render Owner's testimony insufficient. We perceive no error in the trial court's denial of Skinner's motion for directed verdict on the theft count.


CONCLUSION

¶40     We conclude that Skinner failed to preserve his *Robbins* objection to V.M.'s testimony, and that the trial court did not err at all, let alone plainly, in failing to *sua sponte* disregard V.M.'s testimony in connection with its sufficiency-of-the-evidence examination on the aggravated sexual assault counts. In

addition, we conclude that the trial court committed no error in denying Skinner's directed verdict motion on the theft count.

¶41    Affirmed.

———————